# THE STATE v. ALEXANDER, *Appellant.*

1. **Homicide with a Dangerous Weapon**: MALICE: REASONABLE DOUBT. If one intentionally kills another with a dangerous weapon, the law presumes that the killing is malicious, and it devolves upon the slayer to adduce evidence to meet or repel that presumption. If he succeeds in adducing sufficient evidence to create in the minds of the jury a reasonable doubt of his guilt, he is entitled to an acquittal.

2. **Intentional Homicide**: INSTRUCTIONS. Where the uncontradicted evidence shows that a homicide was intentionally committed, and the only question in the case is whether the act was done in self-defense or not, it is error for the court to give the jury an instruction based upon the hypothesis of a killing without a design to effect death.

3. **Evidence of. Character.** The good character of the accused is an ingredient to be submitted to the jury like any other fact, and evidence to prove good character is admissible in every criminal case. If the jury believe the accused to be guilty, they must not acquit him because he has borne a good character; and on the other hand if all the other evidence, taken by itself proves him guilty, they must not, for that reason, fail to consider the evidence of character.

4. **Evidence of Threats.** Upon a trial for murder, evidence of threats made by deceased against defendant, is not admissible to justify the killing, but is admissible as conducing to show that an assault was first made by deceased upon defendant, when there is other evidence tending to prove such assault. When there is none such, evidence of threats is not admissible for any purpose.

5. **Change of Venue.** A refusal of a judge to admit to bail a prisoner charged with murder, is no evidence that he has prejudged the case, so as to entitle the prisoner to a change of venue.

6. **Practice, Criminal**: WHAT CONSTITUTES MISCONDUCT OF THE JUDGE AT THE TRIAL: JUROR CANNOT IMPEACH THE VERDICT. After the jury had retired to consider of their verdict in a criminal case, one of their number sent a note to the judge who presided at the trial, asking advice concerning the case, to which the judge made answer in writing. He also held a conversation with a juror as to how the jury stood upon the question of conviction, and permitted a bailiff to tell him, without rebuke, how they were divided. All these things were done in the absence of the prisoner and his counsel. *Held,* that they constituted a case of misconduct on the part of the judge, which entitled the defendant to a new trial. *Held*, also, that the juror was not a competent witness to impeach the verdict.

*Appeal from Andrew Circuit Court.*—HON. HENRY S. KELLEY, Judge.

The defendant was indicted at the November term, 1873, of the Nodaway circuit court, for murder in the first degree in the killing of one Jacob Norrick. In December following, defendant made an application for bail to Hon. Henry S. Kelley, Judge of the court.

A trial was had upon this application, and evidence was introduced by the defendant for the purpose of removing the *prima facie* presumption of guilt raised by the indictment. The judge having taken the matter under advisement for several days, finally refused the application, delivering an elaborate written opinion, which concluded as follows: "Moreover, the evidence introduced by him, (Alexander) on the hearing, tending strongly to establish a premeditated killing, and being insufficient to repel the *prima facie* case made by the indictment, or to show that the presumption of guilt is not great, his application for bail will be denied. Let the defendant be remanded."

In January following, this opinion was published in full in the St. Louis Journal of Law, a legal periodical which circulated in Nodaway county. At the following March term, the defendant applied for a change of venue, charging that the judge was prejudiced against him, and had prejudged his case. The principal evidence adduced to sustain the charge was the above opinion, as printed. This application was refused. A subsequent application for a change of venue on the ground that the people of Nodaway county were prejudiced against defendant, was granted, and the case was sent to Andrew county, where the motion for a change of venue to some other circuit, on the ground of prejudice of the judge, was renewed and again overruled. There were two mis-trials. Upon the third trial, at the October term, 1875, the defendant was found guilty of manslaughter in the second degree, and

sentenced to imprisonment in the penitentiary for three years.

At this trial Alice Norrick, a witness for the State, testified that her father, the deceased, came home one night with cattle which he and Alexander brought from Kansas; that defendant came to her father's house next morning to get his, defendant's, gun; that he got it, and shot it off, and asked for shot with which to reload, saying he wanted to kill a rabbit; that she handed him some shot, but he said he wanted some larger; that she gave him some larger and he reloaded his gun, and went off about a quarter of a mile from the house to where her father was with the cattle; that she afterward heard the gun go off twice, and saw her father fall to the ground.

Eva Long, a witness for the State, testified that on the morning of the 19th of November, Kyler came for defendant to divide the cattle; that defendant got his gun and loaded it, and took it with him; that two or three days before this she had heard defendant say there would be trouble about the cattle; that he would take his gun and divide them his way, and if any body interfered, they would smell hell.

Frank Crook, for the State, testified: Defendant got on his horse where we were to divide the cattle; he then ordered his brother to drive a certain cow out of the herd. Norrick asked how he proposed to divide; defendant said he proposed to have the pick; Norrick said he proposed he didn't; defendant made some reply and again told his brother to drive out the cow; Norrick told defendant if he divided the cattle that way he must do it over his dead body; Norrick pulled off his coat, and defendant made some reply, did not understand what; they then went off some distance; Norrick said, stop, don't divide the cattle in that way; defendant then rose in his saddle and shot Norrick, who was about ten feet from him; Norrick was on foot; both were going in a walk; the defendant shot again, and Norrick fell dead, with a pretty large sized hole

in his neck; I came up and asked defendant if he had killed Jake, (meaning Norrick); he said he was afraid he had.

Kyler, a witness for the State, gave a similar account of the killing, and added : I rode off to Maryville to get the sheriff; on my return I met defendant on the road and talked with him. He said he had killed Norrick and thought they would hang him for it; said he was ready to die, had considered the deed.

Hooton, a witness for the defense, testified that while they were driving the cattle from Kansas, defendant and Norrick had a quarrel about dividing them, defendant claiming the right to pick, and Norrick denying that that was the contract ; that Norrick drew a revolver, as he spoke, and said that if defendant insisted on dividing that way, he would shoot him; that defendant said he did not want any trouble, and got on his horse and rode off; that the night before the killing he heard a conversation at Norrick's house, between Norrick and Crook, in which Norrick said that if defendant undertook to take his pick of the cattle, he would kill defendant, or defendant would kill him; that Crook said he did not think defendant would undertake to pick, but if he did, he would have to kill them all, or they would kill him; that Crook was present when the shooting took place; had been with Norrick and defendant among the cattle in the early part of the morning, but left and went to Norrick's house, and when he returned, about five minutes before the shooting, he had a revolver at his waist; that Norrick began the conversation about dividing the cattle, by asking defendant how he proposed it should be done ; to which defendant said that he proposed to have his pick, as was agreed in Kansas; that Norrick said he did not so understand the agreement, and if he did pick them, he would have to pick them over his dead body; that defendant then turned and rode away, saying he did not want any fuss ; that he then directed his brother to cut out a particular cow from the herd ; that

Norrick then threw off his overcoat and body coat, and started towards defendant, saying, "come on boys; we will have it out now!" that Crook and Kyler, who were his sons-in-law, followed him; that Norrick walked up within six feet of defendant, carrying an unsheathed bowie-knife; that defendant raised his shot gun from the saddle, where it was lying, and fired without taking aim; that Norrick then advanced and threw up his right arm, with the bowie-knife in his right hand, saying that he was not afraid of his damned old shot-gun; that defendant's horse was walking away from Norrick; that when he had got within four or five feet, defendant fired a second time and killed Norrick; that Crook was about twenty feet from defendant, and was drawing his revolver at this time; that Kyler was about twenty feet from him in another direction, and was advancing on him.

Thompson Alexander, a brother of defendant, was present at the shooting, saw the knife in Norrick's hand during the quarrel, but did not see him raise it; heard him say "come on boys, let's have it out now." The rest of the testimony of this witness agrees in the main with that of Hooton.

William Hart testified, that Crook had told him, that if defendant had not got the drop on Norrick, Norrick would have cut his damned heart out. Defendant offered the depositions of Hall and Russell, who testified that about the 5th or 6th of November, 1873, they fell in with Norrick on the prairie in Ottawa county, Kansas; that Norrick was at the time in company with Alexander and another man, driving a herd of Texas cattle to Nodaway county, Missouri; that Russell offered to purchase the cattle, when Norrick replied that he did not know whether he could sell; that he had had some trouble that morning with one of his partners, a man named Alexander, and did not know whether he could or not; that Norrick, who appeared to be angry and had a pistol in his hand, said that that was the only thing, he supposed, that would ever

bring a settlement between him and Alexander; that Alexander claimed a right to have the pick of the cattle, but that was not the agreement, and he, Norrick, would kill him unless they were divided according to agreement; that he had shown or drawn the pistol on Alexander that morning, and had told him what he would do unless they settled; that Alexander was from fifty to a hundred yards away when this conversation took place. The court refused to permit them to be read to the jury.

Crook being recalled by the State, denied that he had ever had any conversation with Norrick as to what they would do in case defendant insisted on his claim; and denied having any weapon when the killing occurred. Much other evidence was offered by the State by way of impeaching the witnesses for the defense. Other facts appear in the opinion of the court.

*Willard P. Hall* for appellant.

1. The court committed error in overruling the first application for a change of venue, on account of the prejudice of the judge of the court. It is true, that at the time this application was made, in March, 1874, the court had a discretion in the matter; but this was a judicial, not an arbitrary discretion. This court in the absence of evidence, would suppose this discretion was properly exercised. But in this case there is evidence, and the evidence shows a strong prejudice against defendant on the part of the said judge. He had refused defendant bail, and in his refusal said that " the evidence tended strongly to establish a premeditated killing." This opinion was reduced to writing, by the judge who gave it, and was by him furnished to the St. Louis Law Journal for publication, such a publication was inexcusable under the circumstances, and manifests such a bias on the part of the judge as to make him an unfit person to try this case. *State v. O'Rourke*, 55 Mo. 441.

2. The court committed error in overruling the second application for a change of venue, on account of the prejudice of the judge.

3. The court improperly excluded the depositions of Russell and Hall. They tended to show violent threats made by Norrick against defendant, with regard to the division of the cattle, which resulted in the killing of Norrick.

4. There is no evidence to base the sixteenth instruction on. All of the evidence shows that defendant shot deceased with the intent of killing him; and the sixteenth instruction was an attempt to coax the jury into a verdict against defendant, contrary to the law and evidence. It is true that a person indicted for murder in the first degree, may be convicted of any less degree of homicide. Yet the conviction must be of some degree which the evidence shows he is guilty of. *State v. Philips*, 24 Mo. 490; *State v. Sloan*, 47 Mo. 615; *State v. Alexander*, 56 Mo. 131; *State v. Lane*, 64 Mo. 324.

5. The court erred in giving the 13th instruction. That instruction is a commentary upon the evidence, and undertakes to tell the jury what weight they should give to the evidence of defendant's good character. Under our statute, when the court decides that evidence is competent, the jury are then the sole and exclusive judges of the weight they will give to it, and are not to be controlled in their determination by the advice or instruction of anybody. *State v. Hundley*, 46 Mo. 422; *State v. O'Connor*, 31 Mo. 391; *Barton v. St. L. & I. M. R. R.*, 52 Mo. 257; *State v. Henry*, 5 Jones N. C. 65; 1 Wharton Crim. Law, Sec. 643; 3 Greenleaf Ev., Sec. 25; 1 Bishop Crim. Proced. Sec. 489. This instruction amounts to the declaration that character is of no value. It says that in a clear case character has no weight. In a doubtful case the jury must acquit. When, then, does character avail? 1 Wharton's Crim. Law, Sec. 644.

6. The conduct of the judge was improper in receiv-

ing a communication from the jury in writing, and making a written answer to it in the absence of the defendant and his counsel. The answer of the judge to the written inquiry of the juror is equivalent to giving a new instruction to the jury, and is in violation of our statute, which requires the defendant, in case of this kind, to be present during the entire course of the trial. 25 Mo. 167 ; 49 Mo. 328; *Sargent v. Roberts*, 1 Pick. 337; 2 Graham & Waterman on New Trials, pp. 360 & 362; 14 Ohio 511; 51 N. Y. 561; *State v. Cross*, 27 Mo. 332; *State v. Schoenwald*, 31 Mo. 147; *State v. Braunschweig*, 36 Mo. 397; *State v. Jones*, 61 Mo. 232; *State v. Dooley*, 64 Mo. 148.

The conduct of the judge in conversing with the foreman of the jury about the case, in the absence of the defendant and his counsel, cannot be justified or excused. 3 Wharton Criminal Law, Sec. 3309; 1 Pick. 341; *Taylor v. Botsford*, 13 John. 486; *Benson v. Clark*, 1 Cowen 258 ; 24 Wendell 185; *Watertown Bank & Loan Co. v. Mix*, 51 N. Y. 561; Graham & Waterman on New Trials, p. 358; *Holton v. State*, 2 Florida 498.

*Lafe Dawson* for appellant.

1. One of the fundamental maxims of the common law is, that no man shall be judge in his own case, and so firmly is this maxim imbedded in the substratum of our jurisprudence, that it applies in all cases where judicial functions are to be exercised, and excludes all who are interested, however remotely, from taking part in their exercise. Cooley's Const. Lim. 411; *Wash. Ins. Co. v. Price*, Hopkins Chan. 1. When defendant filed his petition verified by affidavit in compliance with the statutes charging the judge with prejudice, and with having prejudged his case, did he not tender an issue in which the judge was an interested party ? Impartiality is the first duty of a judge, and before he sits in judgment in any case, he should be certain that he has no bias, and if he has any (the slight-

est), he is disqualified. Bouvier's Law Dictionary, Title, Judge. After having written and published his opinions, as stated, was it possible for him to enter upon the trial of defendant's case with that degree of impartiality which should characterize all judicial proceedings?

2. The court erred in giving of its own motion instruction No. 16. This instruction was also calculated to mislead the jury, and in all probability did call their attention away from the real issue. The defense was justifiable homicide, and the appellant was either guilty of murder or he was justifiable; but the jury was improperly led away from that issue by this instruction. The idea that the appellant could not be prejudiced by this instruction, cannot be sustained. The court had no right to direct the attention of the jury away from the issue tendered by an instruction on manslaughter in the second degree. Manslaughter in the second degree, under our code, is an unintentional killing. See Sec. 11, page 447, 1 Wag. Stat.; and that there is no evidence to sustain this instruction requires but a slight perusal of the record to discover. It is error in any case to give instructions outside of, or not warranted by the evidence. *Franz v. Hilterbrand*, 45 Mo. 121.

3. The action of the court in receiving a written communication from one of the jurors in reference to the case, and answering said note in writing, on the 27th day of October, as charged in the 15th ground upon which a new trial was asked, is sufficient of itself to vitiate the verdict. After the cause had been committed to the jury by the charge of the judge, no communication whatever ought to have taken place between the judge and the jury, and any direction from him to them, either verbal or in writing, is improper, and will vitiate the verdict. *Sargent v. Roberts*, 1 Pick. 337; 2 Graham & Waterman on New Trials, p. 360.

4. The action of the judge of the court in calling or sending for the foreman of the jury and holding a private conversation with him in reference to this case, which was

then being considered by the jury, is sufficient to taint and cast suspicion on the verdict. Every verdict, especially in capital cases, should be above suspicion; not only must there be no tampering with the jury, but there must be no opportunity given for tampering. *Hare v. State*, 4 Howard, (Miss.) 187; 2 Graham & Waterman on New Trials, 315, 316, 317; *Knight v. Inhabitants*, 13 Mass. 220.

*J. L. Smith*, Attorney-General, for the State.

1. The application for a change of venue presented to the court below the determination of a question of fact. It passed upon it, its finding is conclusive. Sess. Acts 1873, p. 56; *State v. Taylor*, 64 Mo. 137.

2. The depositions of Russell and Hall detailed threats made by Norrick against Alexander, some two weeks prior to the homicide, which the court excluded. It does not appear that the threats were communicated to Alexander prior to the killing, and they were not part of the *res gestae*. *State v. Sloan*, 47 Mo. 604; *State v. Brown*, decided April Term, 1877. It will appear from an examination of the bill of exceptions that the court was most liberal in admitting evidence offered by the defendant, and he certainly has no just cause for complaint.

3. The defendant alleged, in his motion for a new trial, that the foreman of the jury had had a conversation with the judge of the court during the time they had the case under consideration, and that the remarks of the judge during that conversation, influenced the jury in making their verdict. The defendant filed affidavits in support of this allegation, and the State filed counter affidavits. The court below passed upon the question of fact which arose upon the affidavits, namely: whether the judge's remarks influenced the jury in agreeing to a verdict. There is evidence to sustain its finding, to-wit: Bryan's affidavit, who testified that he heard the juror say that he was not influenced by anything the judge said, and it is therefore con-

clusive. The affidavit of Bennett, the juryman, does not enter into the consideration of this question. *State v. Branstetter*, 65 Mo. 149.

4. It is also insisted that there is no evidence upon which to base an instruction for manslaughter in the second degree. It appears from the evidence of Crook, that immediately after the shooting, he asked defendant whether he had killed Norrick, to which he answered he was afraid he had. The remark, taken together with the circumstances surrounding the killing, could well satisfy the jury that the defendant shot the deceased " without a design to effect death, in a heat of passion." 1 W. S., p. 447, § 11.

The evidence shows the defendant guilty of a cruel murder, and he ought to have suffered the penalty of the law for that crime ; but as the jury saw fit, for what reason does not appear, to convict him of a less crime, he surely ought not now to complain.

HENRY, J.—The subject of the burden of proof in criminal cases, and the propriety of giving for the State such an instruction as the fifth, in the case at bar, was fully discussed in *The State v. Wingo*, decided at this term. It was there held that such an instruction was erroneous, but in that and the cases cited to sustain the views expressed in that opinion, there was no instruction declaring to the jury that if they had a reasonable doubt of the defendant's guilt, he was entitled to an acquittal; and while standing alone, the fifth instruction declaring that if defendant intentionally shot and killed Norrick with a shot gun, if the jury find that it was a deadly weapon, the law implies that the killing was malicious, and it devolves upon the defendant to show by the evidence to the reasonable satisfaction of the jury that the killing was justifiable, unless such justification appears from the evidence offered by the State, improperly casts the burden of proof upon the defendant, yet the fifteenth instruction, giving him the benefit of a reasonable doubt of his guilt upon the whole case, gives it

a different meaning, or rather so qualifies it as to make it conform to what we regard as the law of the case. If the evidence adduced by the defendant to show justification or excuse, was sufficient to create in the minds of the jury a reasonable doubt of his guilt, then that is substantially by the fifteenth instruction declared to be proving the justification to the reasonable satisfaction of the jury. We would suggest that instead of declaring, as in the fifth instruction, the court, after stating as in that instruction the presumption of law from an intentional killing with a dangerous weapon, should instruct the jury that it devolves upon the defendant to adduce evidence to meet or repel that presumption. This, with a proper instruction as to a reasonable doubt, would clearly and fairly present the law to the jury.

In the sixteenth instruction the court declared that if defendant, without a design to effect death, in a heat of passion, did kill Norrick in a cruel and unusual manner, by shooting him with a shot-gun, they should find him guilty of manslaughter in the second degree. Frank Crook, a witness for the State, testified that defendant shot twice with a double barreled shot-gun; that defendant raised his gun and shot, and that deceased was about ten feet from Alexander. Eldridge Kyler, for the State, testified that defendant raised up his gun, deliberately took aim and fired. On that point there was no contradictory evidence. It was clearly shown that defendant, a few hours before the killing, emptied both barrels of the gun and loaded it with large shot, nor was there any evidence to contradict this. In his written opinion on the application of defendant to be admitted to bail, the judge who tried the cause correctly stated the law, as follows :

" A man is taken to intend that which he does, or which is the necessary or immediate consequence of his act. To illustrate, if a man within shooting distance of another raises his gun, takes aim and fires, and the ball inflicts a mortal wound from which death ensues, the fair

presumption is that he intended to kill his victim, and it so, the act is certainly murder, unless done in self-defense." The case supposed by him to illustrate the principle is the very case here, and it is a little remarkable that the court having so clear a view of the law, should have given the sixteenth instruction. That defendant intended to kill Norrick, is beyond a doubt. In the case of *The State v. Phillips*, 24 Mo. 475, Scott, J., delivering the opinion of the court, said: " It follows, then, that this was no case for an instruction as to the law of manslaughter in the second degree, for there can be no doubt, unless we stultify ourselves and refuse to permit our judgments to be influenced by considerations which govern all the rest of mankind, that Sullivan Phillips intended to kill Watson." Those remarks are equally applicable to this case, and it was error to give the sixteenth instruction. And here it may be observed that defendant was found guilty of manslaughter in the second degree, the very degree in regard to which the improper instruction was given, of which crime there was not a particle of evidence to warrant his conviction. He was either guilty of murder in one of the degrees of which an intention to kill is an element, or the killing was justifiable.

Appellant complains of the thirteenth instruction given for the State, which declared to the jury " that if they found from the evidence that defendant sustained a good character for peace and order previous to the alleged offense, such good character may be taken into consideration in determining the question of his guilt or innocence, but if they believe, from all other evidence, facts and circumstances, that defendant was guilty, his good character could not be looked to as ground of acquittal." The meaning of this instruction is somewhat obscure. If it mean that if, considering all the evidence, that of good character included, the jury believed him guilty, they should not acquit because he had a good character, it is correct; but if it intended to assert that if all the other evidence proved

the defendant guilty, the evidence of good character was not to be considered, then it is faulty.

The instruction was wholly unnecessary, for no one fit to sit on a jury would suppose that good character entitles an accused to acquittal, when, all the evidence considered, he is proven guilty. All the evidence permitted to go to a jury by the court is for their consideration. The good character of the accused is an ingredient to be submitted to a jury like any other fact in the case. "I cannot, on principle," said Mr. Justice Patterson, in *U. S. v. Roudenbush*, 1 Baldwin 514, "make any distinction between evidence of facts and evidence of character. The latter is equally laid before the jury as the former, as being relevant to the question of guilty or not guilty." The admissibility of this evidence has sometimes been restricted to doubtful cases, but in such cases the accused is entitled to an acquittal without regard to character and evidence of good character is offered to make a doubtful case. It is admissible in all cases, for it is not for the court to say that the case is a clear one. As the instruction is liable to misconstruction, we think it should be modified so as clearly to declare the principle which we think it was intended to announce, and which, as above indicated, is correct.

The court excluded evidence of threats made by deceased against defendant in the State of Kansas, about November 5th or 6th, preceding the homicide, and while defendant and deceased were driving the cattle to Missouri, in the division of which, on their arrival in Missouri, this difficulty originated. These threats were not communicated to defendant. There was evidence tending to show that deceased, at the time of the difficulty, which resulted in his death, first assaulted defendant with a knife. It is unlike the cases in this State in which it has been held that threats was inadmissible. In the *State v. Hays*, 23 Mo. 287, the defendant was the aggressor. No evidence tended to show that he was first assaulted by the deceased. So in the *State v. Taylor*, 64 Mo. 359. When there is evidence

tending to show an assault first made by deceased, evidence of threats, made by the deceased, whether communicated to defendant or not, are admissible as bearing directly upon that important question, which the jury must determine before making their verdict

As was said by the court in the case of *Campbell v. The People*, 16 Ill. 17, " If the deceased had made threats against the defendant, it would be a reasonable inference that he sought him for the purpose of executing those threats, and thus they would serve to characterize his conduct toward the prisoner at the time of their meeting and of the affray. *Stokes v. People*, 53 N. Y. 164. To the same effect is the case of *The State v. Sloan*, 47 Mo. 604. Evidence of threats in such cases is not admissible to justify the killing, but as conducing to show that an assault was made by defendant, when there is other evidence tending to prove such assault. When there is no evidence that deceased made an assault, evidence of threats made by him is not admissible for any purpose. An idle threat, (and a threat which one does not attempt to carry out is to be regarded as an idle threat,) will not justify the threatened person in taking the life of him who made it. Hence, unless an attempt be made to execute the threat, evidence that it was made is wholly irrelevant and inadmissible.

The court committed no error in refusing the application for a change of venue. That a judge is prejudiced against a party cannot be predicated on a ruling in the cause against him. It was the duty of the court to decide upon defendant's application whether he should be admitted to bail, and in that preliminary proceeding his refusal to admit to bail is not to be regarded as prejudging his case. The refusing an application for a continuance might with equal propriety be held as proof that the judge was prejudiced against the party. Sustaining a demurrer to a plaintiff's petition could also be alleged as ground for questioning the impartiality of the court, if appellant's arguments be sound.

After the jury retired to consider of their verdict, one of their number sent a note to Judge Kelley, the circuit judge who presided at the trial, with the following inquiry : " Will the law apply in this case as in dueling ?" The judge wrote on the note : " see instructions 10, 11 and 12," and sent it by the bailiff to the jury. One of the jurors made an affidavit, on the part of defendant, in regard to a conversation had between him and the judge, while the jury were considering of their verdict, which we will not consider, since it is well settled that a juror will not be permitted to impeach the verdict of the jury by making an affidavit alleging their misconduct. But Geo. T. Bryan made an affidavit in which he stated that he heard a conversation between the judge and the juror Bennett, in which Judge Kelley asked Bennett to state what had transpired between them. Bennett said " that the judge asked him if they were likely to agree. Bennett told him they were not, that the jury stood too far apart, and the judge replied that he would like to have them agree upon a verdict if possible, and Bennett replied that there was no chance for agreeing upon a verdict except by a compromise." The judge made no reply. In his affidavit, Judge Kelley admits that he had a converstion with Bennett, in which the latter told him " that the jury could not make a verdict unless they could compromise," and that he made no reply to the juror. It is further shown by the affidavit of W. S. Greenlee, that the judge, while the jury were out, said he intended to send for the foreman, and learn how the jury stood. And William Deakins, one of the bailiffs, who had charge of the jury, states in his affidavit that Judge Kelley, before he had the conversation with Bennett, inquired of affiant how the jury stood, and that affiant told him three were for acquittal and nine for conviction.

There can be no question as to the impropriety of the conduct of the court. His written directions to the jury, " see instructions 10, 11 and 12;" his inquiries as to how

the jury stood, and permitting a bailiff to tell him, without rebuke, that he had ascertained that three were for acquittal and nine for conviction; his silence, when the juror told him they could only agree by compromising, and all these private conversations held in the absence of the prisoner and his counsel, make out a case of misconduct on the part of the court, which it is to be hoped will not occur again. *State v. Patterson,* 45 Vt. 308. In *Sargent v. Roberts,* 1 Pick. 341, Parker, C. J., delivering the opinion of the court, said: "We are all of opinion, after considering the question maturely, that no communication whatever ought to take place between the judge and the jury after the cause has been committed to them by the charge of the judge, unless in open court, and where practicable, in the presence of the counsel in the cause." In Graham and Waterman on New Trials, Vol. 2, p. 360, it is said that "the practice of the courts addressing private notes to the jury, cannot be sufficiently condemned." But it is unnecessary to cite authorities to prove a proposition which at once commends itself to our sense of justice and fairness. The jury are the triers of the facts, and the court has no more right to interfere with them while considering of their verdict, except in open court, to discharge them from time to time, or in the presence of the accused and his counsel, to instruct them as to the law of the case, than the jury have to invade the province of the court.

For the errors above indicated the judgment is reversed, and the cause remanded. All concur, NORTON, J., and HOUGH, J., in the result.

REVERSED.