GOODMAN BOND, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. Where there is no doubt that the prisoner began the encounter resulting in death, previous threats made by the deceased of serious bodily harm to, or against the life of, the prisoner, are not admissible in evidence, though they have been communicated to the prisoner, there being no evidence of any demonstration upon the part of the deceased made at the time of the killing and ap-

parently indicating an immediate intention of executing the threats.

2. Evidence of the reputation of the deceased as a violent, quarrelsome and dangerous man in the community where he lives, is not admissible when the prisoner is the assailant and the killing takes place under circumstances that can afford him no reasonable ground to believe himself in danger of serious bodily harm.

3. The statement of the prisoner is evidence for the consideration of the jury alone, and to be allowed such weight and such only as they see fit to give it.

Writ of error to the Circuit Court for Manatee county.

The facts of the case, so far as necessary to a decision of the points raised by the assignment of errors, are as follows: Goodman Bond, the plaintiff in error, killed Joseph Stephens, at the residence of D. J. W. Boney, in Manatee county, in June, 1877. David Waldron, a witness, who was sitting on the banister, says Bond came out of the house with a gun under his left arm, and stopped on or about the top step and looked around as if looking for some one, and started down the steps shortly, and went out of the gate, and turned to the right and put his hands on the top of the pickets as he walked along, and looked at witness as though he was going to say something to him, but did not until he got to the corner of the paling, and took his hands off, and his eyes off of witness, and went in the direction of Stephens, and William F. Dyass, Jr., and lawyer Hale, where they were squatted down. Just before Bond got to them they all raised up, and looked like they were talking to each other, and he walked by them about eight paces, and stopping, turned around facing them. Morgan Snow and Wm. Dyass, Sr., were fifteen or twenty steps beyond where Bond stopped. Bond stood in the above position about two minutes, when Stephens and Dyass, Jr., started off "quartering" from him to the

house and went towards it in an ordinary gait.
Hale went up close to Bond and said something which
witness did not notice. Witness was about " fifty yards "
(or in another place 45 or 46 steps) from them. He heard
Bond say something to Hale, and witness looked right at
Bond, and saw him throw his gun up to his face, aiming
in the direction of Stephens and Dyass, Jr., who were
walking off quartering from Bond towards the house. Wit-
ness saw Stephens cringe as he was walking and heard him
say: " Good, please don't shoot me," just as Bond threw
his gun to his face and then Bond, as the words were
spoken, fired his gun, and witness saw " the lint of the
clothes fly from the back of" Stephens, who fell. Bond
then threw his gun to his face, apparently aiming at Dyass,
Jr., who jumped towards the house, he cocking and snap-
ping three times at him before he took it finally down.
The cap, if there was one, did not show any fire, " snap-
ping as though he was going to shoot," witness hollering
" Run Bill, I'll be d—d if he don't kill you." Bond then
took the gun in his hand, and took out a pistol and went
towards Snow who had said "don't do that Good," and then
" threw his pistol around Snow and fired in the direction
of Wm. Dyass, Sr." Bond then turned and walked off a
few steps, and then halted till he got behind some corner,
(or " same corner.") The wound was just above the left
hip in the back. This was on the 29th, and Stephens died
the next day.

The occasion of the parties being at the residence of Mr.
Boney, who was a Justice of the Peace, was that Bond had
Stephens and Dyass, Jr., arrested on a charge of burning
his kitchen, and the examination had taken place just be-
fore the fatal occurrence, and resulted in their discharge.
Witness thinks Stephens was visible to Bond from the pi-
azza; when Bond walked up to Stephens, witness saw no

assault or demonstration as if any one intended attacking Bond ; he could have seen any such attempt, &c., had there been any ; Stephens and Dyass, in walking away, were side by side ; Stephens drew no weapon and had none in his hand when he fell ; Bond was twelve or thirteen yards from Stephens when he fired ; no one but Bond had any weapon in his hand ; witness took a small pistol out of Stephens' pocket after he was shot, but did not see him make any attempt to draw it on Bond ; Bond came to Boney's on horseback and his horse was on the public road, rather fronting the house, when the shooting took place, and he was going in the direction of his horse, when he walked out the house until he got to the gate and turned to the right, in a different direction, and went towards Stephens, the horse being to the left ; after turning to the right, Bond, when about 45 yards from Stephens, took the gun from under his left arm and put it under his right arm ; witness had previously seen Bond's gun and two others leaning up in the same house ; on the evening of June 28th, when under guard at Wingate's, Stephens had shown the pistol to witness, and told him that he was afraid of Bond, afraid he would shoot him, and that they thought they had finally got him disarmed and pulled out the pistol ; he begged witness to say nothing about it ; thinks Bond's horse was saddled, could not say positively ; did not hear him say anything to any one about his horse ; the direction from the gate to where Stephens and Dyass and Hale were, was towards Boney's stable ; Snow and Dyass, Sr., witness thinks were standing talking to each other when the shooting took place ; it was a minute or a minute and a half after shooting Stephens that Bond shot at Dyass, Sr., who was then about six feet from him following after Snow, who was going towards Bond, saying "don't do that Bond," and Bond was going towards Snow and Dyass, Sr.;

after Bond fired at Dyass, Sr., I saw the latter run around with an open knife in his hand ; Stephens was coming right towards witness, who was in the piazza ; Dyass, Jr., immediately after the shooting, came to the house and got a gun and got back to Stephens a little after I did ; thinks old man Dyass also got a gun, am not positive ; witness never noticed that Stephens put his hand in his pocket ; did not see any sign of his drawing any weapon ; the pistol was in left hand pocket of pantaloons ; believes Stephens was left handed ; Stephens, Dyass and Hale were not concealed, but simply sitting down talking about their case ; Hale is dead ; witness is positive ·Stephens did not make any attempt to use his pistol on Bond, and that he would have seen any such attempt ; Dyass, Sr.'s, knife was a common large pocket knife ; he did not make any advance towards Bond until after Stephens was shot that witness saw ; nor did he advance on Bond until after B. snapped at Dyass, Jr., his son ; did not see Dyass, Sr., have a knife in his hand until the shooting ; nor did he make any attempt to use the knife on Bond ; he seemed to be endeavoring to keep Snow between him and Bond.

Adam Merser, another witness, describes Stephens, Dyass, Jr., and Hale, as sitting down talking, and Bond walking up opposite to them, and the former two started to the house, and Hale towards Bond, who threw his gun in that direction and shot Stephens, &c. Witness was forty or fifty yards off; Mr. Snow and Dyass, Sr., had been "around the lot" ; saw no demonstrations of an attack on Bond ; no other persons that he saw had any weapons in hand at the time Bond shot Stephens ; was a little excited ; was noticing Bond when he shot Stephens ; Stephens fell at the crack of the gun ; the road Bond would have taken in going home lay to the left of where the shooting took place, though Bond's house was in the direction of the shooting

from the house; Stephens was going quartering from Bond when he was shot; "just before Bond shot Stephens I saw Stephens throw back his hand; could not see whether it was open or not; I was standing quartering from them when the shooting occurred; I do not think S. had any weapon in his hand; when he threw it back he did not turn around; he only looked back; he threw his hand back in the direction of Bond just before the shooting"; when Stephens and Dyass got up and started, they walked pretty brisk; saw Snow and Dyass, Sr., walking up after Stephens was shot, but could not tell where they were before this; does not think Stephens was left handed, but will not be certain.

Wm. Dyass, Jr., testified he and Stephens and Hale were sitting down talking about their (S. & D's.) fee (Hale being their lawyer) and Bond came down near them and stopped. Witness and S. soon after got up and started in the direction of the house and Hale towards Bond, and just as witness and S. were passing B., a little quartering from him, witness heard the report of a gun and S. fell by his side, and witness turned and looked towards Bond and saw his his gun presented towards himself and he ran towards the house. "Nothing was said to Bond when he walked down to where we were, by either Stephens or Hale or myself, that caused him to stop, that I heard. He and Stephens had no words at all. Neither Hale, Stephens or myself made any demonstration against Bond, or any attempt to attack him, or any attempt to draw any weapon; neither of us had any weapon drawn."   *   * "If Stephens made any attempt to draw that weapon on Bond I never saw it. I was close to Stephens up to the time he was shot. I was right with him when he was shot. If he had drawn that pistol I guess I would have seen him,   *   *   certainly would have seen him." Wit-

ness did not hear Stephens speak to Bond just before Bond shot him; says that if S. had spoken he would have heard it; admits that the report of the gun might have shocked him so that he would not have heard him; was badly excited. They were just going back to the house, (having got through talking with Hale,) but not for any particular purpose, nor to get any weapon to assault Bond; were walking in a slow walk. Neither Stephens nor myself had any gun at Boney's. Witness never saw any gun except that repeater. Does not know whether Mr. Stephens, Sr., or Mr. Dyass, Sr., had any guns there or not. He and his father and Joseph Stephens and Wingate went to Boney's together; does not recollect whether Stephens, Sr., went with them or not.

William M. Crews testified that Hale walked up to Bond and said something to him which witness did not understand, and Bond spoke to Hale and then threw his gun around Hale, and Stephens fell, and then witness saw Snow and Dyass, Sr., coming up from behind the fence to Bond, and Snow walked up to B., followed by Dyass, and Snow said "don't do that." Could not say what Dyass and Stephens were doing when B. shot S., but they were in a "moving position;" could not tell whether they were moving towards or from him; Snow and D. were 20 or 25 steps from B. when I first saw them coming up from behind the fence.

D. J. W. Boney testifies that Bond came to his house on horseback and his horse was hitched to the east of the house on the main road. When witness got out of his house after the shooting a young man was leading the horse around where the shooting took place. This was not when he first got out; does not remember whether he was saddled or not. Heard Bond before leaving the house speak to a boy and tell him to carry his horse around in

the direction of his house, as he was going. The horse was 35 or 40 yards from the house when he told the boy to take him around and meet him. When Stephens and Dyass were carried to his house Dyass carried no gun, nor does he think that Stephens did. Old man S. carried a gun there, but young S. did not claim it to be his. There were four guns at his house. The parties who brought guns there as guards were old men.

Joseph May testified, and describes Bond coming out of Boney's house to the fence and stopping, and then going to where Dyass and Stephens were and stopping. "He stood there a short, little time before Stephens and Dyass got up and started to the house," and describes the shooting and attempts to shoot, and says that then Bond *ran*, "ran the other way and left." He says Bond made a little halt and looked all around when he first came out; then went to the fence and looked all around again. Witness was in Boney's piazza, distant about 40 or 50 yards. They were in full sight, saw no demonstrations towards Bond. Thinks he would have seen any attempt to draw a weapon. Bond's gun was a double barrel shot gun.

The defendant offered to prove by the witness, Crews, 1st, that within a few weeks before the death of Stephens he heard Stephens make threats against the life of Bond; 2d, that Stephens bore in the community in which he lived the reputation of a violent, quarrelsome and dangerous man.

Upon objection, the Circuit Judge refused to admit the testimony unless the defendant could show some overt act of the deceased at the time of the alleged killing to carry such threat into execution. Similar offers of proof by two other witnesses except that the threats were alleged to have been made "shortly" or "a short time"

before the death of Stephens, were made and objected to, and excluded on the same ground.

The rulings were excepted to.

The other facts are sufficiently stated in the opinion.

*J. B. Wall, G. B. Sparkman* and *E. M. Graham* for Plaintiff in Error.

Goodman Bond was tried and convicted at the fall term, A. D. 1884, of Manatee Circuit Court, for the murder of Joseph Stephens, and sentenced to the penitentiary for life.

The assignments of error in the case may all be noted under one general head, viz: The exclusion by the Circuit Judge of testimony offered by the prisoner, of threats made against his life by the deceased, and of the violent and dangerous character of the deceased.

The courts are all agreed that where threats against the life of the accused are communicated, and are coupled with some overt demonstration, evincing a present design to put them into execution, they are admissible in evidence, and will mitigate, if not justify the homicide. A good many of them have gone further than this, and we think very properly have held that where threats have been made against the life of a party by one of known violent and dangerous character, and have been brought to the notice of the threatened person, they are, in connection with the violent character of the deceased, admissible in evidence to rebut the presumption of malice, and as showing what reason the accused may have had for believing that his life was in imminent danger at the hands of the deceased.

It is true that David E. Waldron, a witness for the State, testified that he heard Stephens say immediately before the shot was fired, " Good, please don't shoot me;"

but the defendant, in his statement, swears that the remark made by Stephens, as he and William Dyass, Jr., started to the house where their guns were, was, " Now we are going to have satisfaction," and it is a significant fact that young Dyass, who was Stephens' friend and associate in this feud with Bond, who had been arrested with him for burning Bond's house, and who was within a few feet of him when he was shot, while Waldron was at some distance, is silent as to what Stephens did say.

It is a legitimate presumption that if Stephens had said what Waldron testified to, that Dyass, who must have heard him, would also have sworn to it, while on the other hand he would desire to suppress any such remark as Bond claims to have heard.

The unreliability of Waldron's testimony is clearly shown by his evidence as to the probing of the wound by Dr. Mitchell.

But admitting, for the sake of argument, that there was no overt act on the part of Stephens, was the court correct in excluding testimony as to the threats made by him, and of his violent character ? In the case of Robert Jackson vs. The State, decided by the Supreme Court of Tennessee, at the April Term, 1873, and marked in Horrigan & Thompson as unsupported, McFarland, Justice, in giving the decision of the court, says : " We conclude, as we have already said, that to make this defence the defendant must act under an honest and well founded apprehension that it is necessary at the time to take the life of his adversary in order to save his own. But surely, in showing the grounds of this apprehension, he should not be confined to evidence of what occurred at the moment of the homicide. It is said that there must have been an overt act of the deceased at the time, showing his deadly purpose ; but what is an

overt act, and who is to judge whether or not there was such overt act?

"If the parties, previous to the first meeting, had been friends, with no hostile feeling, the deceased, a person of mild temper, certainly an overt act upon the part of the deceased, that would have justified the defendant in taking his life, upon the assumption that it was necessary to do so in order to save his own, ought to be some demonstration of a very decided character, indicating a deadly or dangerous purpose; on the other hand, if the parties were deadly enemies, and the deceased had previously made attempts or threats against the life of the defendant and was known to be a person of violent and dangerous character, likely to execute his threats, then, in such case, upon the parties meeting the defendant would not necessarily be bound to wait until his adversary had actually drawn a deadly weapon, or was in the act of striking."

And again. "Cases may be readily supposed, and no doubt, in reality, often occur, where to require a defendant to wait until his adversary begins the combat would be to require him to wait until there would be but little chance left of successful defence. Cases where the deadly purpose of the party is so fixed and determined, the character so reckless and bloody, his use of deadly weapons so expert and skillful, that to await his attack would be to await almost certain death, and the result of the encounter would often depend upon which party was the quickest in action. In cases of this character a very slight movement might justify either in acting at once upon the assumption that his life is then in instant peril."

Again. "Now it is very apparent that in all cases where previous acts of hostility and threats upon the part of the deceased, in connection with his character and the facts immediately attending the homicide, may establish the fact

that the defendant in taking his life acted under the belief that his own life was in peril, the testimony should be heard, otherwise the true attitude of the parties, and the grounds upon which the defendant acted, and his state of mind, would not appear.

"Naked threats, unaccompanied with personal violence, made by the deceased against the defendant, are admissible to show the reasonableness of the defendant's fears, provided a knowledge of the threats is brought home to him." Monroe vs. State, 5th Ga., 85.

"It is competent to prove threats to show the *quo animo* of the defendant, and rebut the presumption of malice." John D. Howell vs. State, 5th Ga., 48.

Threats made by the deceased, a short time before the commission of the homicide, indicating an angry and revengeful spirit towards the prisoner and a determination to do violence towards his person, which were communicated to the prisoner before the homicide, are evidence for him. Dupree vs. State, 33 Ala., 380.

"In a trial on a charge of murder, the accused has a right to show and prove previous threats of the deceased against him, and the dangerous character of the deceased, as evidence tending to rebut the presumption of malice, and thus mitigate the offence charged." State vs. McNeely, 15th La. Rep., March 21st, p. 369.

"Threats are admissible for the purpose of ascertaining the assailant, and also, when they have been communicated to the defendant, for the purpose of determining whether the threats, under the circumstances, were sufficient to excite reasonable fears in the mind of the defendant." People vs. Tomkin, Cal. Sup. Ct., 15th Rep., April 18th, p. 490.

"On a trial for murder, evidence of a threat made by de-

ceased and communicated to the defendant before the killing, is admissible." State vs. Harris, 76 Mo., 361.

" On the trial of an indictment for murder, threats and declarations of hostile purpose and feeling, made by the deceased on the day and near the time of the killing, and his acts and conduct, indicative of an intention to execute such threats, are admissible in evidence as parts of the *res gestæ*, though the threats were not communicated to the defendant." Pitman vs. The State, 22 Ark., 354; Stokes vs. The People, 53 N. Y.

We would further refer the court to Franklin vs. State, 29 Ala., 14 ; Prichett vs. State, 22 Ala., 39 ; People vs. Lamb, 24 Barber, 342; State vs. Floyd, 6 Jones, 392; State vs. Smith, 12 Rich., 430; State vs. Hicks, 27 Mo., 588 ; State vs. Keen, 50 Mo., 357 ; State vs. Bryant, 55 Mo., 75 ; Ripply vs. State, 2 Head, 217; Pound vs. State, 43 Ga., 88 ; Eggler vs. People, 56 N. Y., 642; Fields vs. State, 47 Ala., 603, 1 Gran., 635 ; Kenner vs. State, 18 Ga., 394.

As to the admissibility of testimony as to character of deceased for violence, we refer the court to Cotton vs. State, 31 Miss., 504; State vs. Garburt, 17 Mich., 16 ; Payne vs. Commonwealth, 1 Met. Ky., 370; and as to testimony of character and threats to Lewis vs. Commonwealth, 8 Va. L. J., Nov., p. 697 ; Binfield vs. State, 15 Neb., 484 ; State vs. Middleham, 62 Iowa, 150; Fitzhugh vs. State, 13 Lea, Tenn., 258 ; Soney vs. State, ib., 472.

" In a prosecution for homicide, threats by the deceased against the accused are admissible in evidence for the defendant." Wood vs. State, 92 Ind., 269.

The defendant offered to prove by several witnesses the known character and reputation of the deceased as a violent and dangerous man, and that he had made repeated threats against the life of the defendant. Had the testimony been admitted, he would have proved by the same

witnesses that these threats were by them communicated to the defendant before the killing.

We think that the court should have admitted the testimony, and then instructed the jury upon the sufficiency of such testimony to mitigate, or justify the homicide.

*The Attorney-General* for Defendant in Error.

MR. JUSTICE RANEY delivered the opinion of the court:

The errors assigned in this case are based upon the refusal of the Circuit Judge to permit the plaintiff in error to prove by witnesses that Stephens, the deceased, had made threats against the former's life, " within three weeks," and a " short while," or " short time " before the killing ; and a refusal to admit proof that Stephens bore the reputation of a violent, quarrelsome and dangerous man, in the community in which he lived.

Where previous threats have been made on the day, and near the time of the killing, they have been held admissible as parts of the *res gestœ*, though not communicated to the defendant before the fatal encounter. Likewise, upon the same principle, they have been admitted when made the day previous and continued uninterruptedly down to the homicide. Pittman vs. State, 22 Ark., 354 ; State vs. Keene, 50 Mo., 357. The principle of their admission in such cases is, that they are parts of the transaction resulting finally in the killing. Bp. Cr. Pro., Vol. I, §§1083, 1087 ; Vol. II, §623. Again, it is held that in a trial for a homicide where the question whether the deceased or the prisoner commenced the encounter which resulted in death is in any manner of doubt, it is competent to prove threats of violence against the prisoner, made by the deceased, though not brought to the knowledge of the prisoner.

Wiggins vs. People, 93 U. S., 465 ; Keener vs. State, 18 Ga., 194 ; Stokes vs. People, 53 N. Y., 174 ; Campbell vs. People, 16 Ill., 18 ; Holler vs. State, 37 Ind., 37 ; People vs. Arnold, 15 Cal., 476 ; People vs. Scroggins, 37 Cal., 676. They will, however, when not admissible on the above grounds, be excluded, though known to the defendant, unless there are circumstances which might reasonably cause him to believe that the deceased, at the time of the killing, had a purpose to carry them out. It is not necessary that the deceased should really have had such purpose. Colton vs. State, 31 Miss., 504 ; Gladden vs. State, 12 Fla., 563 ; 16 Ill., 17. In the case of Holly vs. State, 55 Miss., 424, it was held that when a party with a deadly weapon assaults another, who has done no act and made no motion, gesture or other demonstration indicating any present violent purpose toward the assailant, proof offered by the latter of violence threatened against him by the party assailed will not be admitted ; and that this is true, though the threats extended through several days, and down to the morning of the day in the evening of which the attack was made, and though the party assailed was turbulent and dangerous when drunk, it appearing he was sober at the time in question. Mr. Bishop says, (2 Cr. Pro., §620,) that if the threatened person, in violation of the right of self defence, kills another who has made no overt demonstration, he cannot lay before the jury the known threats upon which he thus unlawfully acted, and that under no circumstances can he introduce the threats, except where other or accompanying proofs and contentions render them admissible on special grounds. In the State vs. Alexander, 66 Mo., 148, it is held that upon a trial for murder, evidence of threats made by deceased against the defendant is not admissible to justify the killing, but is admissible as conducing to show that an assault

was first made by the deceased towards the defendant, where there is other evidence tending to prove such assault ; and when there is none, such evidence is not admissible for any purpose. No exact definition of an overt act can probably be given, but the term certainly embraces everything which could reasonably be construed to evince a present design to make an assault or carry out the threats, and as said in the Mississippi case, " acts which seem but trifles when viewed alone, when considered with preceding facts may become fraught with deadly meaning."

In People vs. Scroggins, 37 Cal., 676, it is held that threats made by the deceased or injured party, if known to the defendant at or prior to the transactions, are admitted for the purpose of showing that the circumstances of the offense were such as to excite the reasonable fears of the defendant that his life was in danger, or that he was in danger of serious bodily injury, and thus justify his act. Judge Crockett, in speaking for a majority of the court, in this case, says : " A person, whose life has been threatened by another, whom he knows, or has reason to believe, has armed himself with a deadly weapon for the avowed purpose of taking his life, or inflicting great personal injury upon him, may reasonably infer, when a hostile meeting occurs, that his adversary intends to carry his threats into execution. The previous threats alone, however, unless coupled at the time with an apparent design then and there to carry them into effect, will not justify a deadly assault by the other party. There must be such a demonstration of an immediate intention to execute the threat as to induce a reasonable belief that the party threatened will lose his life or suffer serious bodily injury, unless he immediately defends himself against the attack of his adversary. The philosophy of the law on this point is sufficiently plain. A

48

previous threat alone, and unaccompanied by any immediate demonstration of force at the time of the rencounter, will not justify or excuse an assault, because it may be that the party making the threat has relented or abandoned his purpose, or his courage may have failed, or the threat may have been only idle gasconade, without any purpose to execute it."

The refusal to admit the testimony in this case was upon the ground that that there was no proof of any overt act upon the part of the deceased. Had the shooting of Stephens taken place just as he, young Dyass and Hale arose from their sitting posture, or Bond's coming up near or opposite to them, the contention would possibly be that such rising was an overt act, but it is clear that it was not so regarded by Bond. According to one witness, Bond, after this, walked by them about eight paces, and then stopped and turned round facing them, and had stood in this position about two minutes when Stephens and Dyass started off " quartering " from him and went towards the house, Hale going towards Bond and getting close to him and saying something, to which Bond replied before he threw his gun to his face and shot. Messer says Bond walked up opposite to them and the two started to the house, and Hale towards Bond, who threw his gun in that direction and shot Stephens. Wm. Dyass, Jr., testifies that Bond came near them and stopped, and soon after Stephens and himself and Hale got up, and Stephens and he started in the direction of the house, and Hale towards Bond, and just as witness and Stephens were passing Bond, a little "quartering" from him, witness heard the report of a gun and Stephens fell by his side. Joseph May testified that Bond went on to where Stephens and his companions were sitting down, and stopped, and stood a " short little time " before Stephens and Dyass got up. When they got up they started to

the house, when Bond shot. Crews says that Hale had walked up to Bond and said something to him and that Bond spoke back, and then he threw his gun around Hale and Stephens fell.

It is clear that Stephens was not walking towards Bond when he was shot. He was walking away from him, and though not directly, yet "quartering," and was, according to the testimony, ten or twelve yards from him. The wound was in the back; "just above the left hip," according to one witness, and "just to the left of the spinal column," according to Dr. Mitchell. There was nothing in his position at the time of being shot, and had been nothing in his action at any time, that evinced any intention of present violence towards Bond, and there was certainly nothing of that appearance which Bond or any one else could have construed with any reason into an indication of a present intent to carry out any previous threats of violence. Bond was armed with a double-barrel shot gun; and to all appearance, Stephens' action, if Bond's presence had any effect upon them, was to get away from him, and to do this he was walking off.

According to one witness, Stephens, just as Bond threw his gun to his face, said, "Good, please don't shoot me," when Bond fired. Another State witness says, "just before Bond shot Stephens I saw Stephens throw back his hand, could not see whether it was open or not; I was standing quartering from them when the shooting occurred; I do not think Stephens had any weapon in his hand when he threw it back; he did not turn around, he only looked back;" "he threw his hand back in the direction of Bond just before the shooting."

If these witnesses are correct in their statements, then Stephens, as Bond throws his gun to his face, turned his head towards Bond enough to see him, but, as the wound

indicates, did not also turn his body around. He could not have been in a hostile attitude, and certainly his plea for his life does not betoken that he was. The throwing back his hand was evidently contemporaneous with the supplication not to be shot, and there is nothing to show that either preceded Bond's throwing his gun to his face. It is almost impossible to imagine that it was anything but a gesture accompanying such supplication, and there is no evidence that there was in it anything of a hostile nature. Both of these witnesses testify that Stephens was going quartering from Bond when he shot. The fact that the pistol was found in Stephens' pocket precludes the assumption that Stephens could have had it in his hand, and there is no testimony of any movement indicating an attempt or purpose to take it from his pocket.

We see nothing which justifies us in holding that the Circuit Judge erred in refusing to admit the testimony as to the threats. There is no doubt as to the prisoner having commenced the hostilities, or that they were all on his side, and there is no hostile act of the deceased with which any previous threat of his can be introduced as part of the res gestæ or to explain.

II. The evidence offered as to the character of the deceased was, we think, also properly excluded. In trials for murder the reputation of the deceased for violence, turbulence and quarrelsomeness is not admissible as a general rule, as these characteristics do not of themselves justify the killing, or excuse or mitigate the offence of the homicide.

In Stevens vs. State, 1 Tex. Ct. of Appeals, 592, it is said: "As a general rule, evidence as to the character of the person injured is not admissible, the character being no part of the res gestæ. In trials for murder the reputation of the deceased may be given in evidence when the circumstances of the case raise a doubt in regard to

the question whether the prisoner acted in self defense. The rule is well settled that the reputation of the deceased ·cannot be given in evidence unless at least the circumstances of the case raise a doubt in regard to whether the prisoner acted in self defense. It is no excuse for a murder that a person murdered is a bad man, but it has been held that the reputation of the deceased may be given in evidence to show that the defendant was justified in believing himself in danger of losing his life or sustaining great bodily injury from the deceased." In Quesenbury vs. State, 3 Stewart & Porter, 308, it was held that on a trial for murder evidence of the good or bad character of the deceased is not admissible, except in cases where the killing is attended by circumstances to create a doubt of its character; as where it appears that the slayer has been ·actuated in the commission of the offense by the principle of self defense, or by some other fact that would excuse the offense; and that the rejection of evidence of bad character of the slain person is not error where the record does not show a state of facts to warrant its admission." If, says the court, the killing took place under circumstances that could afford the slayer no reasonable grounds to believe himself in peril he could derive no advantage from the general character of the deceased for turbulence and revenge. But if the circumstances were such as to leave any doubt whether he had not been more actuated by the principle of self preservation than that of malice, it would be proper to admit any testimony calculated to illustrate to the jury the motive by which he had been actuated. Ibid, 316. In Franklin vs. State, 29 Ala., 14, it is held admissible when it qualifies, explains and gives point and meaning to the deceased's conduct and tends to produce in the mind of the slayer a reasonable belief of imminent danger; and that there are cases also in which

it may be looked to in determining the amount of provocation, and thus fixing the degree of homicide.   In this case the prisoner and deceased were brothers, and worked together in a blacksmith shop.   The deceased went to the prisoner's house with a loaded gun, late in the evening, and near the door of his house used reproachful language and angry words for some time, but did not use any language of menace, or indicating an intention, either present or prospective, to perpetrate violence upon the prisoner. The deceased afterwards went into the house where the prisoner was lying upon the bed, and immediately afterwards the latter said to the former : " You have come here with your arms and I have nothing to defend myself." The deceased then put his gun on the bed where the prisoner was lying and turned and walked off to a table about ten feet away and turned to sit down on the table.   At the instant the deceased sat down, the prisoner, who had taken up the gun as the former walked off, shot the deceased.   The evidence conduced to show that the deceased carried the gun for the purpose of shooting birds, and it does not appear that he had other arms.   The testimony offered, as to the character of the deceased, " as a turbulent and dangerous man," was held inadmissible for either purpose.   " There was not," say the court, in commenting on this testimony, " a word spoken, not an act done, which illustrated by the character of the deceased, and construed in the light of that character, could tend to produce a reasonable belief of imminent peril.   Nor was there any act or word from the prisoner which explained by his character could aggravate his conduct into such a provocation as to mitigate the offense to a lesser degree."

There is no doubt that in the case at the bar the prisoner was the assailant; there is no testimony of any act or word upon the part of the deceased, happening before the gun

is brought to the prisoner's face, which can be construed into a reasonable provocation for his bringing it there to do what the act indicates he intended, and which the result establishes it was his purpose to do. Admit that he was a dangerous, violent and quarrelsome man, and that the prisoner knew it, still the fact is, that there is no proof that his conduct bore any appearance of hostility, but clear proof that when killed he was going off from, and thus, to all appearances, decreasing the possibilities of doing present harm to the prisoner.

After the witnesses for the State and the defence had testified the prisoner made his statement, and immediately his counsel renewed the former offers to prove the threats and the character of the deceased. They were overruled, however, on the same grounds, and exceptions were taken. The action of the court on these renewed offers are covered by what we have said, unless the statement made by the prisoner as to threats and character are to be considered as having a different effect. In Miller vs. State, 15 Fla., 583, it is held that the making of a statement, under oath, does not constitute the prisoner a witness, nor subject him to the rules applicable to witnesses, nor make him liable to cross examination; but that it is simply a presentation verbally, in his own language and manner, of the matters pertaining to his defence, of such facts and circumstances as will go to excuse the offence and negative the idea of willful and corrupt intent, and that it is for the jury alone, and is to be taken into consideration by them in connection with all of the evidence in the case and to be allowed such weight, and such only, as they, in their judgment, may see fit to give it. We have before approved of this view of the statute, and we do not think that it makes the statement of the prisoner as to an overt act such proof as requires the admission of the testimony which was ex-

cluded. No such character has ever been given to a statement by this court. He is given an opportunity of stating whatever he may desire bearing upon his case. He may omit what he pleases, may tell what he deems beneficial, and should he withhold anything it cannot be drawn from him by cross examination, no matter what its character or effect may be. He cannot be made to testify against himself as is allowed in some States where he has voluntarily offered himself as a witness. He has, in this instance, detailed in full what he considered the matters of his defence, and in doing so has laid before the jury the alleged threats. It is a fact that he does not pretend to have thought that Stephens had any intention of using his pistol, but he says that when Stephens and Dyass got up they started towards the house, and he felt fully sure they intended to get their guns. The testimony is that they had not brought any guns to the house, and the house is testified to have been sixty or seventy yards from where the shooting took place. Although he says he knew that his life was in danger, and that of his family, he does not say that he believed his life then in danger. The jury heard his statement and it was for them to give to it such weight and credence as they, in the conscientious performance of their duty, believed it entitled to. The result of the trial was a verdict of murder in the first degree, accompanied by a recommendation to mercy—in effect, so far as the punishment of the prisoner is concerned, the same as a verdict of murder in the second degree.

We do not think the Circuit Judge erred, but are of the opinion that the judgment should be affirmed, and it will be adjudged accordingly.