The State v. Harry Parker, Appellant.—12 S. W. (2d) 428.

Division Two, December 18, 1928.

554

*O. A. Pickett, E. M. Harber* and *A. G. Knight* for appellant.

556

*Stratton Shartel,* Attorney-General, *Walter E. Sloat,* Special Assistant Attorney-General, for respondent.

WHITE, P. J.—In the Circuit Court of Grundy County, April 11, 1927, on a charge of murder in the first degree, the appellant was found guilty of murder in the second degree, and his punishment assessed at ten years' imprisonment in the penitentiary. He was fifty years old at the time of the trial. The homicide occurred November 5, 1926. The victim was Jack Freeman, his stepson, the appellant having married Jack's mother twenty-seven years before the trial when Jack was about ten years of age.

The appellant claims the evidence is insufficient to sustain a verdict and the jury should have been instructed accordingly. Therefore it is necessary to set out the evidence at some length.

It is a sordid story of loose morals and criminal practices. The principal witness for the State was Louise Freeman, wife of the deceased. This woman had been unfortunate. Her parents died when she was a small child and she lived for a time with her grandparents, and early in life it seems she earned her own living. She was a loose character; gave birth to two illegitimate children. Each in turn she gave away in adoption and she never knew what became of either. Later she married a man and lived with him about three months and was divorced. After that she lived about from place to place and finally married the deceased, Jack Freeman. She was intimate with him for two years before their marriage in 1920. At one time before her marriage to Jack she had stolen eighty-six dollars from another girl, and escaped imprisonment because Jack put up the money to secure her liberation. When she married Freeman she agreed that thereafter she would be a good woman, and apparently attempted to live up to that agreement. They went to live with the defendant Parker at his farm. At that time Parker's wife, Jack Freeman's mother, had died. Louise kept her agreement less than a year, yielding to Parker's solicitation and thereafter sustained illicit relations with him until the time of the homicide. After a while she and Jack took a trip to California and were gone several months. They returned to Trenton and Jack opened a restaurant called the "Eatmore" in connection with which he conducted a gambling establishment. They lived in a small house in another part of town. Jack's habits were unsatisfactory. He was diseased, one arm was lame, he drank heavily all the time and frequently was drunk. She said she was disgusted with him and desired to go off where she never would be heard from.

On the night before the fifth of November, 1926, the defendant Parker came into Jack Freeman's restaurant, where they had some argument which seems to have been more or less a quarrel. Mrs. Freeman at home was awakened about 1:20 in the morning of November 5th, by someone knocking at the front door. She went to the door, opened it, and the defendant came in. He had some conversation with her, unnecessary to relate, expressed his resentment at Jack, and said Jack was "awfully drunk" and he was going to end it all that night, indicating his intention to kill Jack. Mrs. Freeman begged him not to. After further conversation he went out of the back door, saying, "Here is where it happens." This was her story.

In a short time Freeman drove up to the garage, in the rear of the house. Presently she heard him shout, "Get to hell out of here!" and accompanied the words with epithets. This was followed by two shots and Freeman's voice crying out, "My God, somebody help!" Another witness testified to hearing these outcries.

She ran out of the front door in her night dress, barefooted, screaming for help; ran to a Mrs. Buster's a short distance away, and as she did so she saw the defendant crossing towards his own home. Some men in the neighborhood being aroused took her to police headquarters in an automobile. Wiley Estes, fire chief, dressed and went to the Freeman home, stopping on the way at the defendant's home, and asked him to go along. After a search they found the body of Jack Freeman in the back of the house near the kitchen door. The garage is at the west of the house and the body was on the south. Two bullets had penetrated his chest, fired from the front, producing death.

Her story of these circumstances is corroborated by other witnesses except as to the fact that Parker came to her house and room before the homicide, and as to his presence about the premises. After the homicide she went to Parker's house and remained there while investigation was being made.

The defense attempted to break down her testimony by introducing her evidence given at the coroner's inquest which began the following day and continued at intervals for two weeks. She appeared before the coroner three times. The first time she denied that anyone was about the premises. She said she had no idea who committed the homicide. She said positively that no one came to her house that night; that she went to bed at nine o'clock. A few days later she appeared again before the coroner's jury and repeated the statement. In her third appearance before the coroner's jury she told the same story except that she said she saw a man leaving the premises as she ran down to her neighbor, Mrs. Buster.

She was arrested for the crime and put in jail where she remained several days. Afterwards Parker was arrested, and on a preliminary hearing she told the same story that she told at the trial about her former relations with him, and about his coming to her room after midnight on the night of the murder. It appears that she was more or less under his influence. She was staying at his house and was escorted by him to the hearing before the coroner. She testified that he told her not to tell anything.

Her evidence at the coroner's inquest showed that she was keeping something back. She was there asked why she did not go to her husband's assistance when she heard his outcry. She said she didn't know. She was asked why she did other acts mentioned in her story, and she said she did not know. In repeated questioning as to her action that night she answered that she didn't know. Mr. Layson, the prosecuting attorney, said that in his opinion she was not telling all she knew about it; that she was holding something back and she must tell it. She stuck to her story. It was further shown that when Parker's name was mentioned while she was before the coroner's

560

jury she would go into a fit of sobbing, which would last for several minutes.

After she went to the police department on the night of the homicide and was brought back home she wanted to go to Jack, and was not permitted to do so. She was told that it was no place for her. All this indicates that the woman was very much wrought up by Jack's murder and Parker's participation in it. There was no substantial evidence which would fix the actual killing upon her. One revolver was found upon her premises. It was a 22-caliber, and it had not been fired recently. The evidence showed that the shots which produced death were from a 38-caliber revolver. Several weapons were introduced in evidence as owned by Parker and by Freeman, but the evidence regarding them is so confusing and uncertain that it throws little light upon the case.

Parker's defense was an alibi. He claimed that he was not about the Freeman home that night; that he had never sustained any improper relations with Mrs. Freeman. He introduced a number of witnesses to testify to his good character.

I. The appellant claims that Louise Freeman was so thoroughly impeached and her evidence so completely discredited that it amounts to no testimony at all, and for that reason a directed verdict for the defendant should have been given. Her testimony, which the defendant offered to discredit her, given before the coroner's jury, shows that at those times she was acting under constraint; that she was not telling the whole story; that she was trying to protect someone. She was at the time staying at Parker's house and manifested great excitement, breaking into crying spells when Parker was mentioned. It was for the jury to say whether her contradictory statements were sufficient to discredit the testimony she gave at the trial. She showed all the natural agitation a normal woman would show when she found that murder had actually been committed. It is possible that she may have consented to the murder or even instigated Parker to accomplish it. But that would not necessarily discredit her story implicating Parker when finally she decided to tell how it happened.

II. Victor Hobbs and John Collins were character witnesses for the defendant, and testified that he had a good reputation for truth and veracity, honesty and as a law-abiding citizen. On cross-examination, these character witnesses were permitted to say that Em Freeman, mother of Jack Freeman, at the time she married Parker twenty-seven years before the trial, was reputed to be a notorious prostitute. This is assigned as error.

The specific objection is that the time in which this report affecting Parker's reputation occurred was too remote to affect his reputation. That would be well enough if the evidence had been introduced to show that Parker had a bad reputation based upon acts reported of him at that remote time. But the cross-examination was to test the credibility and good faith of the witnesses testifying. State v. Parker, 96 Mo. l. c. 390, and Johnson v. Martindale, 288 S. W. 970, are cited. In each of those cases the evidence held inadmissible was direct evidence offered to impeach the character of a witness. That is not the case here. The questions asked here were in cross-examination of character witnesses; the facts brought out were not intended to affect the reputation of Em Freeman, which was irrelevant, nor to affect the reputation of Parker as a defendant or as a witness. It was intended to test the credibility of the witnesses testifying. This court has recently held in several cases that it is permissible to inquire of a character witness what he has heard about rumors of crimes or other delinquencies regarding the party for whose character he vouches. [State v. Cooper, 271 S. W. l. c. 473; State v. Gurnee, 274 S. W. l. c. 60; State v. Seay, 282 Mo. l. c. 676.]

The first witness, Mr. Hobbs, on direct examination was asked by the defendant's attorney how long he had known Harry Parker. The answer was "about thirty years." He had known him as well as anybody. And then this question:

"Q. Known him all that time? A. Yes, sir.

"Q. Are you acquainted with his general reputation for honesty and truth. veracity and being a law-abiding, moral, upright citizen? A. Yes, sir."

The witness then said Parker's character was good.

Then followed the cross-examination in which the witness admitted he had heard that Em Freeman, whom Parker had married, was a notorious prostitute. The other witness, John Collins, testified that he had known Harry Parker thirty years. This question was asked:

"Q. *You have been well-acquainted with him all that time?* A. Yes, sir.

"Q. *Acquainted with his general reputation in the neighborhood in which he resided,* for moral character, truth and veracity, honesty and being a law-abiding citizen in every way? A. Yes, sir.

"Q. Is it good or bad? A. Good."

Then that witness on cross-examination admitted that he knew Em Freeman by reputation, and had heard about her reputation as a prostitute and running a bawdy house at the time Parker married her.

If the State had offered this as affirmative evidence for the purpose of affecting Parker's character, no doubt it would have been inadmissible. But the defendant introduced the two character wit-

nesses and they testified to Parker's character during the time in which they had known him; not what they knew of him recently, but what they had known of him for thirty years. The facts or rumors of reputation upon which they based their estimate of Parker's character, covered what they knew of him during that long period. It was not error to show that they had heard reports at any time during that period which might seriously affect their estimate and therefore their credibility. The defendant might have asked an instruction directing the jury that they were not to consider such evidence for the purpose of affecting Parker's character at the present time, but only for the purpose of affecting the credibility of the witnesses who were testifying, but no such instruction was asked. There was no error in permitting the cross-examination.

III. Appellant complains of error in permitting witnesses to testify that the mention of Harry Parker's name at the coroner's inquest caused Mrs. Freeman to sob and become very much agitated. The defendant offered part of the testimony of Mrs. Freeman given before the coroner's jury for the purpose of impeaching her testimony at the trial, cross-examined her upon it, and the State thereupon offered it all. Her demeanor on the stand before the coroner was just as pertinent and as competent as anything she said. The defendant having introduced her language, it was proper for the State to show her demeanor in explanation of her language. [State v. Schlichter, 263 Mo. 578.]

IV. Appellant contends that the court committed error in permitting the State to read to the jury all the evidence of Louise Freeman taken on three different occasions at the coroner's inquest, and at the preliminary examination of the defendant, on the ground that the statements were self-serving. Specifically appellant says that no part of the said evidence was read by the defendant to contradict or impeach her. The record shows that defendant's counsel in cross-examining Mrs. Freeman asked her about her testimony at the coroner's inquest and at the preliminary examination read questions to her citing the page, asking her if she didn't answer so and so to such questions. The court, in passing upon the admissibility, said that the defendant's attorney read parts of the testimony. In the colloquy which followed the objection, it appears that the defendant's counsel admitted that certain parts of that evidence were admissible, and the counsel for the State admitted that some parts were inadmissible, but neither was sufficiently familiar with the evidence

to point out such parts, and in the absence of any specific objection to any part the court admitted it all. It seemed to be understood that if in the course of the reading any part were found to be objectionable, the defendant's counsel might properly object. But no such objection was made. It was all read We cannot find that the court committed error in respect to that evidence.

V. The appellant assigns error to the exclusion by the court of the evidence of Fred Wickizer. He was asked if he had talked with the defendant the day he was going to trial. He said he had. He was then asked this question:

"Q. State what, if anything, he said—he expected her to kill him?"

The witness was not allowed to answer. Any statement of the defendant, such as was implied in the question, would be pure hearsay, self-serving and inadmissible for any purpose.

VI. It is complained that the court erred in discussing the case with the jury in the Trenton Hotel dining room. As appellant sets out the matter the juror Nichols asked the judge in the presence of the other jurors if he could not give them additional instructions, but the judge told them they already had their instructions and they would have to rely on them. Then the juror requested the court to give them a "raking," as the juror called it, abuse them, and that would help them to reach a decision. The court said:

"No, I can't give you a raking now; I could before I turned you loose, I couldn't do it now."

Something was said about the judge going to leave Trenton and go home, explaining that he would return if they found a verdict, and later he sent a message to the jury room that he had changed his mind about going home and that he would remain and receive a verdict.

That conversation with the juror was plainly a little badinage and hurt no one. The jurors could not take that seriously as an attempt to coerce them. We fail to see in the court's sending word that he would remain and receive a verdict any element of coercion.

VII. The appellant claims that error was committed in giving Instruction 7, and refusing Instruction D-E regarding the testimony of an accomplice.

Instruction 7 told the jury that if they found from the evidence that any witness who had testified was concerned or had participated in the commission of the offense charged against Harry Parker, then such witness should be considered as an

564

accomplice. The complaint is that this does not properly define "accomplice." The chief trouble we find with defendant's objection here is that this Instruction 7 was given by the court at the request of the defendant. The record so shows.

Instruction D-E assumes that some person, indefinitely, was an accomplice in the case. It was properly refused for that reason.

Appellant complains that Instruction 3 was erroneous because it authorized finding defendant guilty of murder in the second degree, and the evidence shows that the homicide was murder in the first degree or nothing, and the jury should have been so instructed. There was no error in giving such instruction. [Sec. 3692, R. S. 1919; State v. Davis, 321 Mo. 598, 12 S. W. (2d) 426.]

We are unable to find any reversible error in the record, and the judgment is affirmed. All concur.