(No. 20981

The People of the State of Illinois, Defendant in Error, vs. Leo V. Brothers, Plaintiff in Error.

*Opinion filed February 19, 1932—Rehearing denied April 6, 1932.*

DUNN and DeYoung, JJ., dissenting.

JAMES C. O'BRIEN, (JOHN OWEN, HARRY J. CANTWELL, and JAMES C. O'BRIEN, JR., of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Leo V. Brothers, the defendant, was found guilty by a jury in the criminal court of Cook county of the murder of Alfred J. Lingle and his punishment was fixed at fourteen years in the penitentiary. Motions for a new trial and in arrest of judgment were overruled.

Lingle, a reporter on the *Chicago Tribune,* was killed on June 9, 1930, at about 1 :30 P. M., in a tunnel used by foot passengers under Michigan boulevard, in Chicago, and connecting Randolph street with an Illinois Central railroad depot. He was shot in the back of the head with a revolver. He fell face down, with both hands in his pockets, a stub of a cigar in his lips and a newspaper under his arm. A number of people were in the tunnel at the time of the killing. The assailant threw the gun down and fled up the steps of the tunnel to the east side of Michigan boulevard, then across the boulevard, zigzagging between automobiles to the north side of Randolph street. He was chased by a police officer named Ruthy and by others but finally escaped in an alley. The weight of the testimony shows he was dressed in a gray suit, although one witness said it might have been a "grayish brown," and another testified that it was dark brown. His hair was light in color. As he fled up the steps of the tunnel he held his straw hat in his hand and remained bareheaded while he ran across Michigan boulevard. It was proved by a ballistic expert that the bullet which killed Lingle was fired from the revolver thrown down in the tunnel. The serial number on the revolver had been obliterated but was restored by a process of etching. The evidence showed it had been previously purchased from a dealer by Frankie Foster.

The principal controversy relates to the identification of defendant as the man who shot Lingle and fled from the scene of the crime. Various witnesses positively identified defendant as being in the tunnel and as the man who dropped the gun and ran up the stairs and across the street. Other witnesses testified with equal positiveness that they were present and that defendant was not that man. Defendant did not testify in his own behalf and no effort was made to establish his whereabouts on the day of the killing.

Otto Swoboda testified that on June 9 he was in the public library at the noon hour and after reading a newspaper went out and saw a man, whom he later learned was Frankie Foster, leaning against the wall on the north side of the library, and another man, wearing a gray suit and a straw hat, standing near by. Swoboda decided to cross the street and go to Grant Park. He entered the tunnel from the west side of the street and after descending the steps a man rushed past him and in doing so bumped against the witness, knocking out of his mouth a lighted cigarette. The man turned around and Swoboda observed two moles on his cheek. The man was wearing a gray suit and a straw hat. Swoboda proceeded to the stairway leading up from the tunnel on the east side of the street. He had gone up three or four steps when he heard a shot. He turned around and started down the steps, when the man who had knocked the cigarette out of his mouth rushed by him with his hat in his hand, going up the steps. Swoboda retraced his own steps and saw a man's body on the floor of the tunnel. He turned and ran up the stairway, yelling, "Catch him!" When he reached the street level he saw the fleeing man stop, look around and then run zigzagging across the street. Upon the trial Swoboda identified defendant as the man who knocked a cigarette out of his month and fled immediately after the shot was fired. He directed attention to the two moles he had observed on the man at the time of the killing.

Patrick Campbell, Warren Williams, Daniel Davidson Mills and Marcus David each positively identified defendant as the man who fled from the tunnel across Michigan boulevard. Williams testified the man passed within a foot and a half of him.

Clark Louis Applegate, a trainer of race horses, in company with his wife, was in the tunnel at the time of the shooting and knew Lingle in his lifetime. He testified he heard a shot, saw a man throw down a gun and come up the steps, looking bewildered; that the man was white as a sheet and ran away, pursued by an officer. He identified defendant as the man he saw. Mrs. Applegate was in Chicago at the time of the trial but was not called to testify.

John J. Reynolds, a priest, was a teacher at Notre Dame University. He testified he arrived in Chicago from South Bend, Indiana, over the South Shore railroad and got off the train at the station at the foot of Randolph street. In going through the tunnel he had almost reached the stairs on the west side when he heard a shot behind him and turned around. He saw a number of men running up the east stairway, but he ran to and ascended the stairway on the west side and proceeded to the edge of the walk. He heard a voice crying out, "Stop that man! Stop that man!" and saw in the street between the safety island and the curb a blond young chap with a gray suit and blond hair making his way rapidly to the curb. He testified: "I followed him with my eyes and then he paused directly across the street from me." The witness fixed this distance at sixty feet, and said he stayed there watching the man run up the street, chased by a policeman. The man turned and ran up an alley. The witness was asked the question, "Do you see anyone in the court room now that you saw that day?" The answer was, "Mr. Brothers answers the description." Later he was asked when he next saw defendant, and stated, "I saw him at the Congress Hotel."

Albert W. Kelfstrom had been a salesman in the Taylor Trunk Works, 28 East Randolph street, for ten years. This building is located between Randolph street and the alley through which officer Ruthy chased the man. Kelfstrom testified that on June 9, 1930, at about 1:35 P. M., he was preparing to go to lunch and had gone into a small room in the store for his hat. As he stepped out of the room he noticed a man near a side entrance of the store. This entrance was not used by customers. It led into the store from a hallway of an office building. The main entrances to the office building and to the trunk store were on Randolph street. The witness described the man as being very pale, and when asked if he wanted anything, pointed to a lady's suitcase and asked the price. It was five dollars, and the man said, "I will take it," without making any examination of the suitcase. While he was buying the suitcase he was standing near a post and could not be seen from the street. He was asked by the salesman whether he desired to take the suitcase with him, and replied, "What time do you close the store?" The witness said, "At five-thirty." The man answered that he would be back about four o'clock. He gave his name as Doherty, without stating any initials. He paid for the case and walked toward the front entrance of the store, where he looked from one side to another through the doors. Then he turned around and came back to the salesman and asked if there was a washroom, and the witness told him, "Yes, come along with me and I will show you where it is." The washroom is located just two or three feet from the side entrance to the store and is lighted by electricity. The salesman turned on the light and walked out of the room. After waiting for some time for the man to return he became curious and went to the washroom. The man was not there and had evidently come out and left through the side entrance unobserved. The witness found in the toilet a small, square piece of white paper with folds in it. The man never re-

turned for the suitcase. He wore a gray suit and a straw hat, and the witness was definite in his identification of defendant as the purchaser of the suitcase.

For the purpose of showing interest of two witnesses, it was disclosed on cross-examination that Swoboda had been paid small amounts of money, ranging from two to twenty-five dollars, by employees of the State's attorney's office for time spent in viewing persons in different States suspected of this crime, and that the witness Williams had been employed since June 15 by the State's attorney as an investigator, at $200 a month.

On behalf of the defendant, Vincent Veitch was called and testified that he was passing the Taylor trunk store on the day of the murder about a quarter to one o'clock in the afternoon and saw a Gladstone bag in the window marked $10; that he walked in to purchase it but learned that the price tag was not on that bag but on a lady's purse; that he could not describe the man who waited on him, except that he had an effeminate way of speaking, and that he was in the store thirty-five or forty minutes and left the store abruptly, "maybe rudely," as it was necessary to keep an appointment.

Lawrence J. O'Malley, a railroad switchman, testified that he was in the tunnel at the time Lingle was shot; that he saw the man who did the shooting and was within six feet of him at the time, and that Brothers was not the man; that the man who fired the shot had on a gray suit and a straw hat; that he did not report what he saw and made no effort to lend aid to the law-enforcing officers of the city because he was making big money and feared his home would be bothered or his job interfered with if the killer was a gangster, and that he was making more money than he could make fooling with any police officer.

Harry J. O'Connor was engaged in the real estate business. He testified that around 1:30 P. M. he was in the tunnel, about ten feet from the east exit; that he heard a

shot and saw a man running along, hugging the rail; that the man wore gray clothes and had a straw hat in his left hand, and that he was turning his face into it, apparently to prevent recognition. Defendant stood, and the witness stated he did not believe the assailant was as tall or as heavy as defendant. He further testified that he had told counsel for both sides he could not identify the man who fired the shot.

Albert Stein, employed in the recorder's office of Cook county, testified that on June 9, 1930, about 1:00 or 1:30 P. M., he, in company with Harry J. O'Connor and a man named Kane, was in the tunnel at Randolph street, about five or six feet from the east stairway; that he heard a shot fired and saw a man running from the scene with two men chasing him up the stairs; that he never saw the man before; that when the man reached the street the sun was streaming down and he looked like a very light-haired fellow, and that he was not as tall as defendant or as heavy and was not the defendant.

Mrs. Abigail Wilson testified she walked through the tunnel on the day of the shooting and was about ten feet from and saw the man who fired the shot; that the color of his hair was light; that defendant was not the man; that she never told any officer she knew anything about the case although she was aware that a search was being made for everyone who knew anything about the killing.

Madeline Whitehurst testified that she saw a young man coming up the stairs and at the same time heard someone in the tunnel saying, "Get that man!" that she got a good look at him; that she was about a couple of yards from him when he was coming out of the tunnel; that she had never seen him before in her life and had never seen defendant before the day of the trial, and that he is not the man she saw coming out of the tunnel.

Paul Thorne, a fiction writer, testified he saw the man who was running on Michigan avenue on the day of the

killing of Lingle; that he had been standing in front of the entrance to the tunnel and heard a shot; that a young man appeared at the head of the stairs, not over five feet away; that he saw him full face, saw his profile as he went by him and saw his back as he went across the street, and that defendant is a taller man than the man he saw in the subway. When asked if defendant was the man he saw coming out of the tunnel the day Lingle was shot, he said, "I should say not." He also testified that after hearing the shooting he got on a bus and went home immediately without going into the tunnel to see what had happened. That night he wrote an anonymous letter to the *Chicago Tribune*. He also wrote a story of the killing of Lingle, which he attempted to sell throughout the country, claiming to be the star witness for the defense, and testified that Roche and Rathburn repeatedly referred to him as a star witness. Roche denied he had made such a reference to the witness.

Pasquale Clarizio, a stock clerk with the Dennison Manufacturing Company, at 62 East Randolph street, testified he saw policeman Ruthy and several people chasing a man through an alley; that he was close to him and got a good look at his face; that he had light hair and his hat was in his left hand; that he weighed about 150 pounds and was about five feet eight inches high, and that defendant was not the man whom he saw Ruthy, a police officer, chasing.

In rebuttal, Captain Daniel A. Gilbert, of the Chicago police force, testified that O'Connor, in the presence of Brooks, one of counsel for the People, stated that when the shot was fired he was about ten feet from the bottom of the stairs at the west approach to the tunnel; that he was so far away from the shooting he could never identify anyone; that he was asked to view defendant, but said it would be useless, as he would not be able to identify the one who fired the shot. Gilbert also testified Stein told him he was with O'Connor and Kane at the bottom of the

stairs at the west approach; that Stein went to the criminal court building to look at defendant, and said he answered the description as to height but was not able to identify him because he did not see his face, color of his hair or profile.

Edward J. Kelly, a salesman living at Kankakee, Illinois, testified he met Thorne on June 9, 1930, and had a conversation with him at 170 North Michigan boulevard about forty-five minutes after the crime had been committed; that Thorne told him he had been about a half a block away from the mouth of the tunnel and that he was not able at that time to describe the man he saw running away.

We will consider the assignments of error in the order in which they are presented by the argument of counsel for plaintiff in error.

The fifteenth instruction given by the court on behalf of the People defined the term "an accessory." It, and also the ninth instruction for the People, directed the jury to find defendant guilty if they believed from the evidence, beyond a reasonable doubt, that he did aid, abet, assist, advise or encourage in the perpetration of the crime, as charged in the indictment. While the record contains some evidence tending to show that one or two persons were with the actual assailant just before the killing and rushed up the stairs with him immediately thereafter, still, it is apparent that the prosecution was based upon the theory that defendant was the actual assailant and not an accomplice. Under the circumstances there was really no substantial basis for giving these two instructions. (*People* v. *McCarthy,* 313 Ill. 303; *People* v. *Blades,* 329 id. 182.) However, the defendant is in no position to complain, because at his request the court gave two similar instructions, (the third and fifth,) which told the jury that a conviction of defendant could not be had unless he actually committed the murder or was present, aiding and abetting it.

The State's given instruction numbered 10 told the jury that if defendant, immediately after the commission of the crime charged against him, fled and remained away until taken into custody, such flight is a proper circumstance to be considered in determining his guilt or innocence. Two objections are urged against this instruction. One is, that it was stipulated that defendant lived in Chicago from January, 1930, to November, 1930, and therefore there was no evidence that he had fled and remained away until taken into custody. The other objection urged is, that the word "flight," in its legalistic sense, must include flight from the place of habitation and abode of the accused. No error was committed in the admission of evidence tending to show that the man who shot and killed Lingle immediately threw down his weapon and precipitously fled through the tunnel, up the stairway, across crowded streets and disappeared in an alley while being chased a great portion of the distance by a police officer and by citizens, who were crying out, "Stop that man!" The conduct of the assailant in his efforts to avoid capture tended to bespeak his guilt and a desire to escape arrest. By the common law flight was considered so strong a presumption of guilt that in cases of treason and felony it carried the forfeiture of the party's goods, whether he were found guilty or acquitted. (1 Wharton on American Crim. Law, sec. 714.) In this country flight does not generally raise a presumption of guilt but may be shown in evidence as a fact to be considered by the jury and from which they may draw an inference of guilt. (*Fox* v. *People,* 95 Ill. 71; 16 Corpus Juris, 551.) The instruction complained of did not direct a verdict. It simply told the jury that if they believed that immediately after the commission of the crime defendant fled and remained away until taken into custody such fact is a proper circumstance to be considered in determining his guilt or innocence. Such a flight as was shown by the evidence, even if unaccompanied by subsequent seclu-

sion or concealment, was proper for the jury to consider. It was unnecessary to prove subsequent concealment, and the instruction placed a greater burden on the People in that regard than was essential. Defendant was not harmed by imposing an additional and unnecessary burden upon the People.

After defendant had been taken into custody he was exhibited to a number of witnesses for identification by a method known in police circles as the "show-up." In other words, he was placed in a room by police officers and the witnesses at different times were permitted to look through a slit in a curtain upon defendant under a strong light. The evidence shows that the identification by the People's witnesses was first made under such conditions. Defendant requested, and the court refused to give, the following instruction, to-wit:

"The court further instructs you that where one under arrest is brought alone before a witness for the purpose of identification and the witness knows that the party arrested is to be presented for that purpose, an identification under such circumstances cannot be given the same weight and credibility as where the witness picks out the accused from a number of unknown persons."

Defendant insists that the instruction is almost in the precise language used by this court in *People* v. *Crane*, 302 Ill. 217. In discussing the testimony of certain witnesses in that case it was said that such an identification cannot be given the same weight and credit as where the witness had picked out the assailant from a number of unknown persons. The court was merely expressing its views concerning the probative force of such testimony and was not endeavoring to lay down a rule of law to be announced by instructions to juries. Nothing is better settled than that the weight and credit to be given testimony is a question for the jury and that the court is not permitted to influence the jury by commenting on its weight and

credit. (*People* v. *Tyler,* 316 Ill. 67; *People* v. *Calseg,* 311 id. 365.) The instruction was properly refused.

Patrick Campbell, a witness for the People, was asked on cross-examination by counsel for defendant if he had ever been in trouble, to which question an objection was sustained. Later he was asked if he had ever been indicted, and an objection to that question was sustained. No intimation was given of counsel's purpose in asking these questions, but after the verdict had been returned a motion for a new trial was entered, and one of the assignments of cause was that the court erred in limiting the cross-examination of this witness. A supporting affidavit was filed setting forth that the witness was under indictment in the criminal court of Cook county by the name of John Campbell and was charged with conspiracy to commit robbery; that John Campbell and the witness Patrick Campbell are one and the same person; that he was released upon entering into recognizance in the sum of $2500, without surety; that when his case was called for trial he did not appear and his bond was forfeited and a *capias* ordered to issue; that thereafter the judgment of forfeiture was vacated and Campbell was again released upon his own recognizance in said sum; that the fact of Campbell's indictment under the name of John Campbell was not known to defendant until the day previous to the making of such affidavit; that all of such facts were material and relevant on the trial as showing an interest of the witness and a motive for giving false and perjured testimony against defendant. When the questions were propounded to the witness the trial court could not visualize that counsel's purpose was to show interest or motive. The questions, standing by themselves, were obviously objectionable. It is proper to disclose the interest of a witness by showing he has been promised immunity from prosecution or that he has received favors which might influence his testimony, but a witness cannot be required to answer the bald ques-

tion if he has ever been indicted unless the court is apprised of a legitimate purpose for asking it. The fact that a witness has been indicted cannot ordinarily be shown for the purpose of affecting his credibility. (*People* v. *Decker,* 310 Ill. 234; *People* v. *Garippo,* 321 id. 157.) According to the counter-affidavits filed, the fact that John Campbell and Patrick Campbell were one and the same person was known to counsel for defendant prior to the time of the trial. Under the situation existing the questions were improper.

The police officer who chased the fleeing man across Michigan boulevard, down Randolph street and up alleys until he lost sight of the man was Anthony Ruthy. It appears that an assistant State's attorney who appeared for the People felt the officer should be accounted for on the trial and accordingly suggested it to the court, and stated that he regarded Ruthy as an unreliable witness and had previously so regarded him; that no suspect had ever been shown to him for identification; that he was mentally unbalanced because of a previous brain injury, and that he is able to function in the performance of some of his police duties but under excitement is unreliable and undependable. Counsel asked that the officer be called as the court's witness, so that both sides could have an opportunity to cross-examine him. Quite a lengthy colloquy was had between the court and counsel for the respective parties in the absence of the jury, at the conclusion of which Ruthy was called as a witness, and his testimony conclusively showed his mind was severely deranged. He was not asked to identify defendant as the fleeing man. The evident purpose of the State in wanting him called as a court's witness was to reveal his mental condition and to explain to the court and jury why he had not been called as a State's witness. It was not to offer any proof of identification or of guilt. The proceedings were unusual, quite unnecessary and without benefit or injury to anyone. A

deranged person may be a competent witness where, notwithstanding his affliction, he is capable of observing accurately and stating correctly what he observed and of understanding the nature and obligation of an oath. (40 Cyc. p. 2201.) Ruthy's testimony demonstrated that he was not capable of observing accurately what he had seen, and this condition was well known to the assistant State's attorney. Ruthy could not be classified as a competent witness, and, although his testimony cannot be said to have been harmful, he should not have been accepted as a witness for the court or otherwise. During the discussion it was developed that Ruthy had at one time identified Frankie Foster as the man he had chased. This identification was made at the instance of those representing Foster. When this circumstance was disclosed, one of the attorneys for defendant said, "Do you mean to say, Mr. Brooks, that he [Ruthy] identified Foster?" Upon receiving an affirmative answer, defendant's counsel asked if there was a record of that hearing, and after some further discussion another one of the attorneys for defendant said to the court, "We intend to call him—subpœna him as our witness—and we will be responsible for him." Thereupon the assistant State's attorney again told the court he considered Ruthy an unreliable witness, and the attorney for defendant interposed the remark, "You have no right to say that; call an alienist." Defendant never objected to Ruthy on the ground of incompetency and the record contains no such objection. When it appeared that Ruthy had at a former time identified Foster as the man he had chased through the streets and alleys, counsel for defendant showed a willingness to speculate upon the situation and endeavored to have the court compel the State to vouch for the credibility of the witness, in the apparent hope that he would say the man he chased was Foster and not defendant. Counsel went so far as to say he would call the witness on behalf of defendant and be responsible for him. Under the cir-

cumstances defendant cannot now be heard to complain that Ruthy was called by the court.

The next alleged error is that the trial judge was guilty of improper conduct in receiving a communication from the jurors, and in withdrawing from them, in the absence of defendant, a form of verdict to be used in case defendant was found guilty of manslaughter. This occurred after the jury had retired to deliberate upon their verdict. They sent the following written communication to the judge:

"Your honor, are there any instructions relative to this case in 27-D? All instructions we have are on verdict 21.

H. W. GROTZER, *Foreman.*"

With the above communication the judge received the five forms of verdicts he had submitted to them, as follows: (1) Finding defendant guilty of murder and fixing his punishment at death; (2) finding him guilty of murder and fixing his punishment at imprisonment in the penitentiary for life; (3) finding him guilty of murder and fixing his punishment at imprisonment in the penitentiary for a term of years not less than fourteen; (4) finding him guilty of manslaughter; and (5) finding him not guilty. Instruction 27-D was the manslaughter form of verdict, and the jury by their communication asked if there were any instructions relative to it. No instruction on the law of manslaughter had been asked by either party or given by the court. There was no evidence in the case to warrant the giving of an instruction on that subject or of a form of verdict concerning it. When the court's attention was called to the fact that he had included a form of verdict as to manslaughter he withdrew it and returned the other forms to the jury. Shortly afterwards the jury returned a verdict. The record shows that the form of verdict finding defendant guilty of manslaughter was presented to the court through inadvertence. Too often have mistakes and grievous errors crept into the record through a practice of submitting "ready made" or "canned" instructions. Some at-

torneys prepare stock instructions and forms of verdict and file them away for future use. When occasion arises they are hastily gathered and submitted to the court without inspection or serious thought. This practice is often employed notwithstanding its danger and frequent condemnation by this court. It is responsible for the alleged misconduct of the trial court in this case. Communications from judge to jury should be made in open court in the presence of the parties, and it is an almost universal rule that if any statements material to the issue be made by the judge to the jury in the absence of the defendant and his counsel a new trial will be awarded. Of such importance is an untrammeled deliberation by the jury that courts will generally grant a new trial when any communication with a jury, either by the judge or a third person, is in any way calculated to prejudice the defendant. He must be present at the charge of the court whether such charge is given before the jury is permitted to retire or at a subsequent time. Wharton on Crim. Pl. & Pr. sec. 547; *People* v. *Kohler*, 5 Cal. 72.

This court condemned unwarranted communications between the court and jury in *Fisher* v. *People*, 23 Ill. 218. The jury in that case came into open court and in writing asked the presiding judge whether or not they were the judges of the law as well as of the facts. They were told they were not and that the law as given by the court should govern them. On the next day they again came into open court and asked for further instructions. The judge reiterated his charge of the previous day and told them it was not lawful for them to go behind his instructions. On the third day they came and inquired concerning the credit to be given the testimony of witnesses. The judge answered their question. He was then told there was little prospect for an agreement on a verdict and the jury asked to be discharged. The judge replied, "Before the next term of the court the witnesses may be in their graves and justice may

be cheated of its victim." The defendant was on trial for murder and was found guilty. The conduct of the trial judge in the *Fisher case* was palpably erroneous and prejudicial to the defendant. The judgment was reversed.

Other cases in which new trials have been awarded because of improper communication between judge and jury after retirement are *Crabtree* v. *Hagenbaugh,* 23 Ill. 349, where the judge went inside of the room in which the jury were deliberating and discussed the instructions with them; and *Chicago and Alton Railroad Co.* v. *Robbins,* 159 Ill. 598, where the jury sent a written request to the judge to ascertain the time to which to compute damages and the judge returned a written reply telling them to compute them up to the present time; and *City of Mound City* v. *Mason,* 262 Ill. 392, where the judge went into a jury room and answered oral questions pertaining to the party's rights; and *People* v. *Beck,* 305 Ill. 593, where the judge, in answer to a request of the jury, sent in an additional instruction in the absence of the defendant and without having the jury brought into open court; and *People* v. *McGrane,* 336 Ill. 404, where an additional instruction was given in the absence of the defendant. In each of these cases the conduct of the judge was calculated to influence the deliberation of the jury and therefore constituted reversible error, but no case is cited, and, indeed, we have not been able to find one, where this court has reversed a judgment because of an act or ruling of a judge which did not tend to influence the verdict of a jury.

In this case there was no evidence whatever to warrant a verdict of manslaughter. The proof conclusively showed that the crime committed was murder, and whether or not it was committed by defendant was the only substantial question in dispute before the jury. There would be no more justification for a verdict of manslaughter than there would be for robbery, consequently no form of verdict finding defendant guilty of manslaughter should have been

given. It is said that defendant's rights and interests were affected because the jury might have returned a manslaughter verdict, and thereby he would have suffered a lesser penalty. This claim is without reason or logic, for if the jury were not authorized, under the law, to return a manslaughter verdict, and if the elements of manslaughter did not appear from the evidence, defendant was not entitled to such a verdict upon any theory. A deprivation of a right never results from withholding from a person something to which he is not entitled. The question was whether or not defendant was guilty of murder. There was no issue of manslaughter in the case. The form of verdict for manslaughter should have been withdrawn, and the action of the judge in doing so was right. While it would have been better procedure to have done it in the presence of defendant, still, he suffered no prejudice, and the action of the judge cannot be made the basis for a reversal of the judgment. As a general rule in this and other jurisdictions, judgments, either in civil or in criminal cases, will not be reversed when it is apparent that no injury has resulted from a communication to the jury, either by the court or by third persons. Thus, in *Rafferty* v. *People*, 72 Ill. 37, the trial judge, in the absence of the defendant charged with murder, sent a message to the jury that he would meet them at seven o'clock the next morning. It was urged that this constituted an improper communication and hastened a verdict of guilty against the defendant. The court, after considering the circumstances surrounding the sending of the message, decided that it could not have hastened the verdict, and said: "Although the message was improperly sent, yet if by no possibility it could work an injury to the prisoner it ought not to vitiate the verdict." To the same effect are the cases of *State* v. *Parker*, 321 Mo. 553, *Collins* v. *State*, 78 Ga. 87, *Commonwealth* v. *Heven*, 162 Mass. 521, and *Horrman* v. *Newman*, 37 N. Y. Supp. 199. In the last mentioned case

the jury sent two written questions regarding the case and the judge endorsed on the message that he had no further charge to make.

In *Adams* v. *People*, 47 Ill. 376, it was alleged that the jurors were persuaded by expressions and opinions of divers persons they were allowed to hear during the trial. It was held that the jury were not influenced, even in the slightest degree, by such expressions, and that unless it was shown that such exposure operated in some way to the prejudice of the prisoner, a verdict for that cause alone should not be set aside.

In *People* v. *Strause*, 290 Ill. 259, there were a number of acts of misconduct complained of, and among them were several alleged unwarranted communications with the jury. The court held that the verdict should not be set aside for any one of the many acts of misconduct charged, but they might be given weight in connection with other matters which took place on the trial in deciding whether or not the verdict should be disturbed, and it was said that all courts doubtless agree that any misconduct which was prejudicial to the accused or which improperly influenced the jury is ground for setting aside a verdict of the jury. This is the true rule, and it is announced in *Gott* v. *People*, 187 Ill. 249, *Marzen* v. *People*, 190 id. 81, *Martin* v. *People*, 54 id. 225, and *People* v. *Rogers*, 303 id. 578.

Privacy of jury deliberations should be zealously protected against invasion, but the cardinal test on a motion to set aside a verdict on that ground is whether or not the invasion was calculated to influence the verdict of a jury. If it was not so calculated it would be idle to disturb a verdict. Often it is practically impossible to prevent a juror from communicating with a trial judge, as when he approaches the judge and asks permission to telephone to his family or to say that he is sick. Surely such harmless communications of themselves are an insufficient excuse for setting aside a verdict or reversing a judgment.

One of the grounds urged for new trial was newly discovered evidence. There was filed an affidavit of Carl Eddy, which stated that on the day of the murder he was driving north on Michigan avenue about 1:30 P. M. and when he was almost at Randolph street a man ran from the sidewalk at the exit from the tunnel under Michigan boulevard and against affiant's car; that such person uttered an oath and continued to cross the street in a westerly direction; that he was short and stocky, had blond hair, was dressed in a gray suit and carried a straw hat in his hand; that he did not communicate this information to anyone until the trial of defendant was nearing completion, when he consulted an attorney and was told to give the information to the trial judge; that he went to the criminal court building and was advised by the judge's bailiff that the evidence was in and the closing arguments were being made; that while he was at the criminal court building he saw defendant, and that defendant was not the man he saw running on Michigan boulevard. The most that can be said of this offered testimony is that it related to identification of Brothers and was cumulative. A new trial should not be granted in order to receive it. In addition to that, the testimony would be of a highly uncertain character. It could all be true and yet relate to any one of a number of persons who were running across the avenue, or relate to a time altogether different from that when it is claimed the assailant ran across the street.

The affidavit of Louis McCann was also filed. It stated that he was in the tunnel and saw the man fire the fatal shot and that said man was not the defendant; that affiant subsequently talked with representatives of the *Chicago Tribune* and with persons connected with the State's attorney's office; that when Brothers was exhibited to him in the Congress Hotel he stated he was not the one who had killed Lingle; that he was told by assistant State's attorney McShane to instruct his wife not to answer the door if

anyone called at his home; that a subpœna was left at his home and he thereafter communicated with the assistant State's attorney; that he went to the office of said attorney and was informed that the subpœna was illegal because it was not personally served; that notwithstanding such information he went to the criminal court on the day mentioned in the subpœna and attempted to see the trial judge but was unable to do so; that he returned to the court the next day and was unable to get into the court room; that he was directed to go to the witness room, which he did, but was not called to the stand and did not testify at the trial. The material facts of this affidavit were denied in a counter-affidavit by the assistant State's attorney. The counter-affidavit stated that McCann had not told affiant that defendant was not the man who fired the shot, but, on the contrary, McCann had said defendant was the man who fired it, and that McCann also said he was afraid to testify to that fact. The counter-affidavit further stated that McCann had been seen in communication with attorneys for the defense prior to the time the trial was finished. It is quite evident that neither party cared to use him as a witness and that both parties had ample opportunity to use him if they had so desired.

Another ground urged for a new trial is that defendant was advised by his counsel not to take the stand and in pursuance of such advice did not testify. It is urged that such advice was improper and resulted in serious injury to defendant. Whether or not it was prudent for defendant to testify in his own behalf was a matter for consideration and determination by him and his counsel at the time of the trial. It does not appear from the record that his counsel were either incompetent or unfaithful. Such being the case, the wisdom of the conclusion reached by defendant and his counsel cannot now be questioned.

It is contended that the verdict is contrary to the weight of the evidence. We have very carefully examined and

considered all of the evidence in the case and we cannot agree with that contention. The identification of defendant as the killer was the principal contested question of fact. It appears to us that the testimony of the witnesses who identified defendant as the man who threw down the gun and fled from the tunnel and across the street is more convincing than the testimony of the witnesses for defendant. Under all the evidence the jury would have been warranted in fixing a penalty much greater than they did, but the penalty is within the limits fixed by the statute. The jury heard the evidence and saw the witnesses, and the province of fixing the penalty belonged to them and their decision is final in that matter. The record contains no error sufficient to disturb the verdict, which appears to have been justified by convincing evidence showing the guilt of defendant beyond a reasonable doubt.

The judgment is affirmed.　　　*Judgment affirmed.*

DUNN and DEYOUNG, JJ., dissenting:

The evidence in the record in regard to the identity of the plaintiff in error as the murderer of Lingle is exceedingly contradictory. As set out in the opinion of the court, of the witnesses who saw the man who fired the fatal shot and fled from the scene of the crime an equal number stated that the plaintiff in error was the man and that he was not. It is hardly practicable to set out or discuss in detail in an opinion all the cross-examination of each witness and all the evidence of circumstances tending to contradict or to corroborate each witness, and it is not necessary for the purpose of this dissenting opinion. It is sufficient to say that the evidence was in strong conflict. In our judgment it is difficult to say on which side of the issue was the preponderance of the evidence, much less to say that it was convincing of the guilt of the plaintiff in error beyond a reasonable doubt. However that question may be determined, the error of the court in com-

municating with the jury after they had retired from the bar requires a reversal of the judgment. The error occurred in the following manner: The court in instructing the jury read an instruction as to the form of the verdict which included three forms in case the verdict should be guilty, varying according to the punishment imposed—whether death, or imprisonment for life, or for a term of years—and another form in case the verdict should be not guilty. These four forms of verdict, with another marked "27-D," finding the defendant guilty of manslaughter, were delivered to the jury. They retired, and after they had deliberated more than twenty-four hours a written communication signed by the foreman was sent to the judge asking if there were any instructions in the case relative to form 27-D. As stated by the court in the bill of exceptions, this occurred very shortly before the verdict was returned. The judge, on receiving this note, sent for all the forms of verdict which had been submitted to the jury, and, finding them in proper form except 27-D, retained the latter, returned the others and sent word to the jury that there were no further instructions. All this occurred out of the presence and hearing of the plaintiff in error and his counsel and the jury were not brought into court. The manslaughter form of verdict was sent to the jury, as certified in the bill of exceptions, by inadvertence. An assistant State's attorney handed the forms of verdict in a murder case, including the manslaughter form of verdict, to the judge, who gave them to the jury without examination.

Early in the history of the State it was decided at the April term, 1859, in *Fisher* v. *People,* 23 Ill. 218, (orig. ed. p. 283,) that it was improper for any juror to communicate with the court, in writing or verbally, in reference to any matter belonging to the case, but if the jury desired to communicate with the court it should send a request to the court through the officer in attendance, that the jury might be brought into court in a body. It is true, as said in the

majority opinion, that there were other errors in that case which required a reversal of the judgment, but it is also true that the court condemned the permitting of any of the jurors, while they were deliberating, leaving the jury room and coming into court and holding a conversation with the judge, and also condemned the court's making such a request of the foreman or any other member of the jury, saying it was liable to great abuse. In the same volume, at the January term, 1860, is reported the case of *Crabtree* v. *Hagenbaugh*, 23 Ill. 289, (orig. ed. p. 349,) the nature of which does not appear, though it appears in 25 Ill. 214, (orig. ed. 233,) that it was an action of assumpsit for a breach of contract. The opinion, which was written by Mr. Justice Caton, was short, and it was thought unnecessary to consider any other fact in the case than the action of the judge, who, upon the invitation of the jury, went to the jury room and talked with the jurors on the subject of the instructions given them. It was said in the opinion: "This was manifestly done with no improper motive on the part of the judge and it may be that it had no influence with them in the formation of their verdict. Indeed, the most the judge did was to decline to explain the meaning of the written instructions which had been given to the jury. We choose to assume that what was said and done by the judge while in the jury room did not influence the jury in their deliberations, for we think that, independent of its effect upon the jury, the judgment should be reversed for the simple reason that such an interview did take place. If in this case no harm was actually done and for that reason the verdict is allowed to stand, we open the door to the inquiry in all such cases as to whether the party has been injured by the interview. Such an inquiry should not be tolerated. The policy of the law requires that all the proceedings of the court should be open and notorious and in the presence of the party, so that if he is not satisfied with it he may take exceptions to it in the mode pointed out by the law and not be put to extraneous

proof to show that an error has been committed in a secret proceeding, and, in fact, out of court." This case has been cited and consistently followed in our decisions.

In *Chicago and Alton Railroad Co.* v. *Robbins,* 159 Ill. 598, the court, in response to a note from the foreman of the jury inquiring whether damages should be assessed to the commencement of the suit or up to the present time, wrote on the same note, "Up to the present time," and sent it back by the bailiff who had brought it to him. The court, while holding that the answer stated the law correctly, reversed the judgment for the giving of it, and in doing so quoted the opinion in *Crabtree* v. *Hagenbaugh, supra,* and also quoted *Fisher* v. *People, supra, Sargent* v. *Roberts,* 1 Pick. 337, and *O'Connor* v. *Guthrie & Jordan,* 11 Iowa, 80, and cited *Kirk* v. *State,* 14 Ohio, 511, and *Taylor* v. *Betsford,* 13 Johns. 486. In *City of Mound City* v. *Mason,* 262 Ill. 392, it was held error for a trial judge to hold any communication with the jury in regard to the instructions in the case except in open court, and that it was immaterial whether the instructions given were right or wrong. *People* v. *Beck,* 305 Ill. 593, decided the question the same way.

There are many cases in other States to the same effect. *Sargent* v. *Roberts, supra,* was decided by the Supreme Judicial Court of Massachusetts in 1823 and is a leading case upon this question, which has been followed by the courts of many States. In that case the foreman of the jury sent a note to the judge informing him that the jury could not agree and awaited his directions. The judge replied in writing, saying that he was unwilling that the jury should separate and giving them such directions as would enable them to reconsider the case in a more systematic manner. After this a verdict was rendered in favor of the defendant. The court said: "As it is impossible, we think, to complain of the substance of the communication, the only question is whether any communication at

all is proper, and if it was not, the party against whom the verdict was is entitled to a new trial. And we are all of opinion, after considering the question maturely, that no communication whatever ought to take place between the judge and the jury after the cause has been committed to them by the charge of the judge unless in open court, and, where practicable, in the presence of the counsel in the cause." So, in deciding a case in which the circumstances were similar, the Supreme Court of Iowa said in *O'Connor v. Guthrie & Jordan, supra:* "If further instructions are to be given to the jury, though the same in principle as those already given, the parties have a right to require that they shall be given in open court, that an opportunity may be afforded to know what they are, except to them if desired, and ask others explanatory, if deemed necessary. Indeed, the necessity for adherence to this practice with strictness is so manifest that argument in support of it is quite unnecessary. It may, at times, it is true, be attended with inconvenience, but better so than permit a practice so liable to abuse and so much in conflict with the rights of parties litigant."

In *State* v. *Murphy,* 17 N. D. 48, the trial judge, being informed that the jury, or some of the jurors, wanted to communicate with him, went to the jury room about 8:30 or 9:00 o'clock in the evening, rapped on the door, and, upon its being opened, stepped inside, leaving the door ajar, and while standing in the open space said to the jury: "Good evening, gentlemen. I understand you want to see me. Have you agreed?" The foreman answered: "No; I think we cannot agree." The judge then, after a pause of a second, replied: "I will ask you to consider the matter further. Good night," and thereupon withdrew and closed the door. In a short time the bailiff reported to the judge that the jury had agreed. The court, in the consideration of this action of the judge, said: "As to the purity of the intentions of the judge in going into the jury

room in this case and there having the brief communication with the jury no certificate or proof is necessary so far as this court is concerned, as it well knows that his uprightness and sincere desire to be absolutely just and fair in all cases are beyond question. That admitted fact, however, does not meet the question before us, which is, Did he do that which was beyond his judicial functions in respect to the case? We are forced to the conclusion that he did. His presence in the jury room for any kind of communication with the jury is not contemplated by any provision of the statute. The opposite is the plain inference from the statute. All communication to the jury in open court is subject to exception by the parties if deemed improper. If any communication is made to them in the jury room in the absence of the parties no opportunity is afforded for objections and exceptions at the time. The open court is the place for communications to the jury in the presence of, or on notice to, the attorneys. The jury room is for the jury alone, and no communications are allowed with them in the room except upon orders from the court through the officer in charge of them, who is permitted to ask them whether they have agreed upon a verdict. All communications to the jury in reference to the case should be made in open court and all communications to them in the jury room avoided. In this way all distrust and fear that something improper is said or done will be without foundation and every act be subject to exception and review. Any communication by word or writing not in open court affects the efficiency of jury trials as a means of accomplishing justice after giving all parties full opportunity of being heard at all stages of the trial. A strict compliance with this practice of having all proceedings in court in the presence of counsel or notice to them, unless waived, is better than to countenance violations thereof unless prejudice is shown. The State urgently insists that no prejudice could have resulted from

what was done or said in this case, but we shall not consider that question. However, the fact that the foreman said that he thought they could not agree when the judge first spoke to them and that they did agree in five or ten minutes thereafter would be a stubborn fact for consideration if we entered upon an inquiry as to the effect upon the jury of the words spoken to them and the visit to the room. We think that any communication in this way as to the case should be prohibited and held prejudicial. It is against the policy of the law to indulge in secret communications or conferences with the jury or with jurors in reference to the merits or law of the case. To determine, in each case, whether prejudice resulted would be difficult, if not impossible, and justice will be better subserved by avoiding such communications entirely. The authorities are practically unanimous in condemning such communications and in holding them prejudicial as a matter of law."

In *State* v. *Wroth,* 15 Wash. 621, the court said: "In the discharge of his official duties the place for the judge is on the bench. As to him the law has closed the portals of the jury room and he may not enter. The appellant was not obliged to follow the judge to the jury room in order to protect his legal rights or to see that the jury was not influenced by the presence of the judge, and the State cannot be permitted to show what occurred between the judge and the jury at a place where the judge had no right to be and in regard to which no official record could be made."

In *Havenor* v. *State,* 125 Wis. 144, the court said: "These rights are clearly of an important nature and affect the substance of a jury trial and the right of a party to be heard or to bring in review every transaction of the court's proceedings. For the attainment of the best administration of justice, the law requiring that all proceedings of court be open and public and in the presence of the parties or their representatives must be strictly enforced,

and in case of any infringement of this policy parties are not to be put to the burden of showing that it in fact injured them, even though it be manifest that no improper motives prompted the acts complained of."

Other cases in which it has been held to be error where any communication of the judge with the jury or with a juror or jurors, either personally in the jury room or by written communication or telephone, after the retirement of the jury from the bar, in the absence and without the knowledge of counsel, has been held to be error for which the judgment must be reversed, without regard to the innocent or injurious nature of the communication, are *Hoberg v. State,* 3 Minn. 26, *Coolman v. State,* 163 Ind. 503, *State v. Alexander,* 66 Mo. 148, *State v. Bland,* 9 Ida. 796, *Grace v. State,* 147 Ga. 672, *State v. Ashley,* 121 S. C. 15, and *Watertown Bank and Loan Co.* v. *Mix,* 51 N. Y. 558.

The principle decided in all these cases is that announced in *Sargent* v. *Roberts, supra,* and the four decisions in which we have made the same announcement, that no communication whatever ought to take place between the judge and the jury after the cause has been committed to the jury by the charge of the judge unless in open court, and, where practicable, in the presence of the counsel in the cause, and that, independent of its effect upon the jury, the judgment should be reversed for the simple reason that the communication did take place, and that no inquiry will be tolerated as to whether any harm was actually done. The defendant had a constitutional right to a public trial and to be present at every step in such trial, and, as was said in *State* v. *Ashley, supra,* having reached the conclusion that the mere fact of the communication was a violation of this right, we find it unnecessary to consider whether any errors of law occurred in the substance of the communication. However, it is clear that whatever did occur was prejudicial to the defendant. We have not the form of the verdict before us because it was not included in the

bill of exceptions. We know only that it was a form of verdict of guilty of manslaughter, and the jury had it before them in the same manner as the other four forms of verdict, and considered it, and were justified in considering it, as a part of the instructions given by the court. Their inquiry was whether the instructions applied to that form of verdict. The jury had that form of verdict, as well as the other forms of verdict, all attached together by a clip, and naturally might be expected to want to know what it had to do with the case and what their duty was in reference to it, hence their inquiry. The court withdrew the manslaughter form of verdict, and without any explanation to the jury sent back the other four forms, with an oral notice to the jury that there were no further instructions. All this occurred in the absence of the plaintiff in error and his counsel. There can be no pretense of justification of any such communication between the judge and the jury not in open court and not in the presence of the plaintiff in error and his counsel. The jury had the manslaughter form of verdict, given apparently by the court, the officer took it to the judge, who kept it and returned the other four forms of verdict with the oral message sent by the officer that there were no further instructions. This was a modification of the instructions out of court in the absence of the accused, with no opportunity for him to ask any further instruction which he or his counsel might deem necessary to protect his rights, and the court's opinion holds that the accused, to obtain a review of this unconstitutional invasion of his rights, must be put to extraneous proof to show that an error has been committed and that he has been injured in a secret proceeding, and, in fact, out of court. Whether prejudice could or could not have resulted to the plaintiff in error from the action of the judge in withdrawing the form of verdict and sending word to the jury that there were no further instructions is not a question for consideration in this connection.

However, the record indicates that the jury had not agreed and were considering the manslaughter form of verdict in connection with the instructions when the communication was sent to the judge, and the fact that shortly after the communication of the judge to the jury a verdict was agreed on, would be, as said in the similar case of *State v. Murphy, supra,* a stubborn fact for consideration if an inquiry were entered upon as to the effect upon the jury of the communication between the judge and the jury. The jury had been out more than twenty-four hours and had not agreed but were considering the manslaughter form of verdict and desired further instruction from the court. To their inquiry the court answered that there were no further instructions and withdrew the manslaughter form of verdict. Almost immediately after the judge's communication—"very shortly," in the words of the bill of exceptions—the jury returned a verdict of guilty of murder, fixing the lowest penalty under the law. These facts show clearly the effect of the judge's communication in hastening the action of the jury, and, under the authorities which have been cited, the court's action was in violation of the right of the defendant to be present at every stage of the trial and vitiated the verdict.

If this single case were the only one to be affected by this judgment it might not be a matter of serious importance, but it is of serious importance if this case becomes a precedent. A strict compliance with the practice of having all proceedings in court in the presence of the accused and his counsel, with an opportunity to be heard at all stages of the trial, is a fundamental requirement of a jury trial in this State which has been maintained by an unbroken line of decisions. It is against the policy of the law of this State to indulge in secret communications between the judge and the jury, and for the failure to observe this fundamental requirement in jury trials, the judgment, in our opinion, should be reversed.