**People of the State of Illinois, Plaintiff-Appellee, v. James Gardner (Impleaded), Defendant-Appellant.**

**Gen. No. 51,051.**

First District, Fourth Division.

July 3, 1968.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Marshall J. Hartman and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James R. Truschke, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE McCORMICK delivered the opinion of the court.

CHARGE: Unlawful sale of narcotic drugs.

DEFENSE: Denial of the charge.

JUDGMENT: After a jury trial defendant was found guilty and sentenced to 10 years to life in the Illinois State Penitentiary.

POINTS RAISED ON APPEAL:

1) Defendant was not proved guilty beyond a reasonable doubt.
2) The jury was interrupted in its deliberations.

EVIDENCE: On behalf of the State evidence was introduced that on March 28, 1962, at about 10:30 p. m., one Monty Blue went to police headquarters where he told Police Officers King and Kelly of the Narcotics Section that he could buy heroin that night and would lead them to the seller. He was searched thoroughly by the police, and no money or narcotics were found on him. Afterwards the police gave him $12 in marked money, and he drove with Officer Kelly in a squad car to the vicinity of 39th Street and Ellis Avenue in Chicago. Officer King drove to the area in his squad car which he positioned in a gas station near Cottage Grove and Oakwood, later moving to another station near Oakwood and Ellis.

Blue testified that he left Officer Kelly's squad car at 39th and Ellis and went to 40th Street and Oakwood, where he stood for two or three minutes, when the

defendant, James Gardner, and a girl named Billie Widerman drove up in a car. Blue asked the defendant if he could get some heroin; the defendant told him to wait, and he sent the girl down the street. Blue and the defendant then went around the corner into a hallway on Oakwood Boulevard, where he gave the defendant a $10 bill and two singles, the marked money he had received from Officer King. The defendant then gave him two packages and Blue returned to Officer Kelly's car. The defendant went down Oakwood Boulevard. Blue testified that when he returned to Officer Kelly's car he told him he had made the purchase; Officer Kelly radioed Officer King who told them to come to the gas station located across the street from the place Blue and the defendant had met. When they reached there Officer King came to Officer Kelly's car and Blue gave Officer King the two packages he had purchased.

Officer Kelly testified that after Blue left his car he saw him walk to the corner and saw the defendant and the girl approach him; that the girl walked down the street and Blue and the defendant walked around the corner; that he saw Blue contact no one else, and that Blue was out of his sight for only about 45 seconds. Officer Kelly further testified that Blue got into the squad car and rode with him to contact Officer King; that when Officer King came to Officer Kelly's car Blue handed Officer King the foil packages; that Officer King immediately tested one of them and found that it was heroin. Officer Kelly stated that after the conversation with Blue, Officer King left and arranged to meet Officer Kelly and Blue at Powers Restaurant, a short distance from where the sale was made.

Both Officer King and Officer Kelly testified to the transfer of the tinfoil packages from Blue to King. After testing the contents Officer King took the packages of heroin to the Narcotics Unit, 1121 South State Street.

Officer King testified that he saw Blue and the defendant go to the corner, but did not see them inside the hallway; that Blue returned to the squad car, and a minute later he, King, received a radio message from Officer Kelly that the sale had taken place. After Officer Kelly drove his squad car to the station where Officer King was parked, King got into Kelly's car, performed a field test on the white powder in the packages given to him by Blue, and determined that it was heroin. Officer King testified that after a complete description given him by Blue of the people concerned he instructed Blue to enter a restaurant and observe the defendant and the girl. When they were identified by Blue pointing to their backs, Officer King arrested the two persons. They were searched, and the marked $10 bill was found in Billie Widerman's purse, and a marked $1 bill was found on the defendant. When questioned Billie Widerman said she had received the money in payment for her work. Later, on cross-examination she said she had received the $10 from the defendant.

The defendant, James Gardner, testified that he and Billie Widerman were going home after a movie when he saw Sonny Crockett, who owed him $7 from a poolroom bet; that he parked his car and approached Crockett who was with Blue, and demanded his money; that Crockett gave him a $10 bill and Gardner got $5 change from Billie Widerman, then received $2 more in singles from Crockett as payment in full. He stated that he then left and met Billie Widerman in a nearby restaurant where they were later arrested. He testified that he did not sell narcotics to anyone.

The jury found Gardner guilty, but deadlocked as to Billie Widerman who was then discharged.

The defendant argues that the informer, Blue, should be disbelieved because he testified that after he made the purchase from Gardner, Officer King paid him $18 so that he could pay his rent. It is also argued that Blue

should not be believed because he had stated on direct examination that he was not an addict and that the last time he used narcotics was nine months before; that he took the stand in the afternoon and testified that the previous statement was not true, and that he actually had used narcotics the day before the trial.

In People v. Bazemore, 25 Ill2d 74, 182 NE2d 649, cited by defendant, the court stated that where the State's case rests solely upon the credibility of a narcotics addict, both the trial court and the reviewing court must carefully and closely scrutinize the testimony of the witness. The court further stated that it does not necessarily follow that the addict's testimony must be disbelieved, and added that there were other circumstances which cast doubt upon the reliability of the witness. That case is not applicable to the one before us since the situations are entirely different. We might point out that in the instant case the conviction is not based solely on the credibility of Blue.

In his brief in the instant case the defendant argues that the name of Sonny Crockett had come up in the conversation between the police and Blue, and that in fact, Crockett was the man the informer intended to turn over to the police that evening. The argument in the brief continues:

> Now, then, it all becomes crystal clear. Sonny Crockett arranged to meet the informer that night on the corner. They met, the exchange was made, Crockett had the money, and the informer had the narcotics. Suddenly, the defendant appeared, parked his car, seized Crockett by the arm, and demanded the $7.00 that Crockett owed him.
>
> Crockett suddenly saw an opportunity to dump the money which could be hot. He therefore gave the money to the defendant and left. The informer now is perplexed. The fish has left the trap and

is clean as a whistle. Crockett has left sans marked money and sans narcotics. What to do. But wait. Here is a man with the money. Put it on him. I'll tell the police that he was the seller. They'll never know, after all they can't see this far as to make out his face.

So, therefore the informer returned to the police and described the defendant. They proceed to Powers' restaurant, where the informer points out the defendant to the police and exits.

Thus the real seller has escaped, and the defendant is left holding the bag.

In its brief the State says:

The defendant's story is completely unbelievable. First, the defendant testified that he was driving and saw Crockett who owed him money. That he stopped, walked over to Crockett, argued with him, took ten dollars, went back to his car to get change, came back and got an additional two dollars from Crockett, and left. (The abstract has a stronger statement concerning the meeting with Crockett, which statement does not appear in the State's brief. There the testimony of the defendant was as follows: "I drove around the block and came back and found a parking space and I parked and I jumped out of my car and ran across the street and grabbed him. I grabbed this man, Crockett. I asked him for my money because I had been—I mean, I had been looking for him for about three weeks. Well, when I asked him for my money he told me he didn't have it but in his hand he had some money . . . I grabbed his arm and pulled his hand to let him know I see he had some money in his hand. . . . He gave me the ten.") Officer Kelly testified that he saw Blue meet the defendant and the co-defendant and that Blue and the defendant

walked away and were out of sight no longer than one minute. It would be impossible for the defendant to have seen Crockett, as he testified, go over and argue with him, go back to his car, and then return to Crockett within one minute. Officer King testified that Blue and the defendant came around the corner and went into a hallway where he lost sight for no more than one minute. If, as the defendant claims, he walked into the hallway, Officer King would have seen him especially since the defendant testified that he walked into the hallway twice. Yet Officer King testified that he saw no one else.

■ ■ The jury had the right to determine which witness was telling the truth, and it has been repeatedly held that the trial judge or the jury who sees and hears the witnesses is in a much better position to find the truth than the reviewing court which has before it only the printed page. The jury found the defendant guilty, and we cannot reasonably say that they were not justified in so finding.

■ The defendant then argues that the trial judge improperly interrupted the jury. After the jury had been out for approximately two hours, the judge instructed his bailiff to see if they were close to reaching a verdict. The bailiff reported that they were not even close. Afterwards the court discussed the matter with the defense counsel, and as far as the record appears, in the presence of the defendant. Later the jury was called out into the courtroom and the foreman was asked if they were about to reach a verdict. The foreman reported that they could reach a verdict as to one defendant only, at which point the court directed them to return to the jury room, adding: "Let the bailiff know when you are ready to come out. If you have reached a verdict on one defendant you so find, and then you let me know whether you think you can reach a verdict on the other defendant

. . . get your verdict prepared, whatever it might be on one defendant." The jury returned a verdict of guilty as far as James Gardner was concerned, but were unable to reach a verdict as to Billie Widerman.

The defendant argues that under People v. Rohwedder, 78 Ill App2d 211, 223 NE2d 1, this conference with the jury constituted reversible error. To the extent that the Rohwedder case supports this proposition we disagree with its conclusion. The key to this situation as expressed in the Supreme Court cases is the question of whether or not a communication with the jury was calculated to influence the verdict or resulted in prejudice to the defendant.

In People v. Tilley, 411 Ill 473, 104 NE2d 499, the defendant alleged as prejudicial error that the trial judge was guilty of improper conduct in communicating with the jurors after they had retired to deliberate upon their verdict. The judge went to the jury room in company with a bailiff to inquire if there was any hope of arriving at a verdict. One juror stated they wanted further information, whereupon the judge told them to read the instructions. He explained that any new instructions would have to be given in the presence of the attorneys and the defendant. The court said at page 477:

> "It is insisted that any communication whatever between the judge and the jury, except in open court with the defendant present, is prejudicial error entitling defendant to a new trial. Several early decisions are cited in which the language of the court tends to support this contention. But the holdings in such cases were discussed in People v. Brothers, 347 Ill 530, wherein an exhaustive review of the authorities on the present question was made, and the rule was announced that judgments will not be reversed when it is apparent that

108

no injury has resulted from a communication to the jury, either by the court or by third persons."

The court then quoted from the Brothers case as follows:

"Privacy of jury deliberations should be zealously protected against invasion, but the cardinal test on a motion to set aside a verdict on that ground is whether or not the invasion was calculated to influence the verdict of a jury. If it was not so calculated it would be idle to disturb a verdict. Often it is practically impossible to prevent a juror from communicating with a trial judge, as when he approaches the judge and asks permission to telephone to his family or to say that he is sick. Surely, such harmless communications of themselves are an insufficient excuse for setting aside a verdict or reversing a judgment."

In People v. Canada, 81 Ill App2d 220, 225 NE2d 639, the court said at page 234:

"Finally, defendant argues that prejudicial error occurred when the trial judge, some time after the jury had retired to deliberate, recalled the jury to the jury box and inquired of the foreman: 'If the jury deliberated longer, is it possible that the jury will arrive at a verdict?' Defendant relies on People v. Brothers, 347 Ill 530, 180 NE 442, but we find in that case nothing which would require reversal in the case at bar. The trial judge here did not, in our opinion, say or do anything which was calculated to influence the jury's verdict."

■ It should be noted that in the Rohwedder case neither defendant nor his attorney was present at the time of the conference with the jury. Here, however, defendant's counsel was in court; he had conferred with

109

the defendant; no objection was made to the holding of the conference, and neither in this court nor in his post-trial motion has it been suggested that defendant was not present.

We find no error in the record before us, and the judgment of the Circuit Court is affirmed.

Affirmed.

DRUCKER and ENGLISH, JJ., concur.